Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
02/12/2019 08:08 AM CST

Brandon G. Speers, appellant, v.
Natalie Johns, now known as
Natalie Daniel, appellee.
___ N.W.2d ___

Filed February 12, 2019.    No. A-17-1189.

1. **Child Custody: Appeal and Error.** Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

3. **Child Custody: Intent.** When a parent sharing joint legal and physical custody seeks to modify custody and relocate, that parent must first prove a material change in circumstances affecting the best interests of a child by evidence of a legitimate reason to leave the state, together with an expressed intention to do so.

4. **Modification of Decree: Child Custody: Proof: Intent.** Proving an intent to leave the state does not necessitate that physical custody be modified, but the intent to move illustrates the likelihood that there is a need for considering some sort of modification that would reflect the new circumstances.

5. **Child Custody: Proof: Intent.** Once the party seeking modification has met the threshold burden of showing an expressed intention to leave the state, the separate analyses of whether custody should be modified and whether removal should be permitted necessarily become intertwined.

6. **Child Custody.** A court evaluates whether the best interests of the child are furthered by the relocating parent's obtaining sole physical custody and moving the child out of state.

7. ____. As a practical matter, the existence of a joint physical custody relationship is likely to make it more difficult for the relocating parent to meet the burden associated with relocation.

8. **Modification of Decree.** Changes in circumstances which were in the contemplation of the parties at the time the prior decree or order was entered do not qualify as material changes in circumstances for purposes of modifying a decree.

9. **Modification of Decree: Child Custody.** If the alleged reason for a custodial parent to leave a state was contemplated at the time of the entry of the prior order, such reason to leave cannot be considered legitimate.

10. **Child Custody.** A move to reside with a custodial parent's new spouse who is employed and resides in another state may constitute a legitimate reason for removal.

11. **Child Custody: Visitation.** There are three broad considerations ordinarily to be employed in determining whether removal to another jurisdiction is in a child's best interests: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation arrangements.

12. **Child Custody.** The ultimate question in evaluating the parties' motives in seeking removal of a child to another jurisdiction is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party.

13. ____. The list of factors to be considered in determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children should not be misconstrued as setting out a hierarchy of factors. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted.

14. **Child Custody: Visitation.** Consideration of the impact of removal of a child to another jurisdiction on the contact between a child and the noncustodial parent, when viewed in light of reasonable visitation arrangements, focuses on the ability of the court to fashion a reasonable visitation schedule that will allow the noncustodial parent to maintain a meaningful parent-child relationship.

15. ____: ____. Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent, which necessitates considering the frequency and total number of days of visitation and the distance traveled and expense incurred.

16. \_\_\_\_: \_\_\_\_. Indications of a custodial parent's willingness to comply with a modified visitation schedule have a place in analyzing the reasonableness of a visitation schedule.

Appeal from the District Court for Lancaster County: Susan I. Strong, Judge. Affirmed.

Eddy M. Rodell for appellant.

Kelly T. Shattuck, of Vacanti Shattuck, for appellee.

Moore, Chief Judge, and Bishop and Arterburn, Judges.

Arterburn, Judge.

## I. INTRODUCTION

Brandon G. Speers appeals from an order of modification entered in the district court for Lancaster County. On appeal, he assigns as error the district court's decision to modify the prior order granting the parties joint physical custody by granting sole physical custody of the minor child to Natalie Johns, now known as Natalie Daniel, and granting Natalie's request to remove the minor child to the State of Iowa. He argues that Natalie failed to prove that a material change of circumstances existed since the entry of the prior order. He further argues that Natalie did not have a legitimate reason to remove their child from the state and that removal is not in her best interests. For the reasons set forth below, we affirm.

## II. BACKGROUND

Brandon and Natalie are the biological parents of Paisley S., a daughter born out of wedlock in December 2012. Following a brief hearing on August 23, 2016, at which both parties and no other witnesses testified, the court approved a stipulated paternity order and parenting plan. Pursuant to the parties' joint stipulation and parenting plan, they shared joint legal and physical custody of Paisley. Although Paisley's primary residence was Natalie's home, the parties shared physical placement of Paisley on an "8-6 basis." This meant that Natalie had

physical placement and parenting time with Paisley for 8 days during every 14-day period while Brandon had physical placement and parenting time for the remaining 6 days, an arrangement the parties had followed since separating in 2014. During the summer, the parties agreed to alternate care of Paisley on a "week on - week off" basis. The parties agreed to an upward deviation in child support whereby Brandon would pay to Natalie $450 per month in exchange for not sharing in a full range of Paisley's expenses. The division of holidays and other financial obligations were also set forth in detail in the joint stipulation and parenting plan.

Natalie filed a complaint to modify on June 15, 2017. In her complaint, Natalie stated that a material change warranted modifying the original decree and parenting plan because she had married a man who lived in Glidden, Iowa. She contended modification was in Paisley's best interests and requested that she be granted primary physical custody and the ability to remove Paisley to live in Glidden. A trial on Natalie's complaint was held on November 1.

At trial, Natalie testified in her own behalf and her husband testified on her behalf, while Brandon testified in his own behalf and his neighbor-landlord and his sister testified on his behalf. At the time of trial, Paisley was enrolled in preschool in Waverly, Nebraska, and during her parenting time with Natalie, lived in a two-bedroom apartment in Lincoln, Nebraska. Natalie married Gregory Daniel in May 2017. Gregory lives outside of Glidden, which is approximately 168 miles from Waverly, where Brandon lives. Gregory works as a diesel mechanic for a tractor company and anticipated taking over his family's 1,500-acre farm near Glidden within the year following trial due to his father's impending retirement. At the time of the hearing, Natalie was pregnant and was due to give birth on Christmas Eve 2017. When Natalie and Gregory found out she was pregnant, they married in May 2017.

Natalie testified that allowing her to remove Paisley to Glidden would be beneficial, because Natalie would no

longer need to work and would have more time with Paisley. Moreover, instead of living in a two-bedroom apartment, they would be living on an acreage in a 2,800-square-foot house. Gregory confirmed that he would support Natalie being a stay-at-home mother and that he had sufficient income for them particularly once he took over the farm. Gregory anticipated that his income would double once he took over his father's farming operation. Natalie testified that her and Gregory's overall expenses would be greatly reduced by allowing removal in that they would no longer have two households to support and there would be no childcare expenses. Natalie noted that throughout Paisley's life, Natalie has been her primary caretaker and provided her primary residence. Natalie has been the primary parent to take Paisley to her medical appointments and has more flexibility to miss work when Paisley is ill. Natalie has worked as a hair stylist.

Natalie acknowledged that her family and Brandon's family all live in Nebraska and see Paisley on a regular basis. She noted, however, that Gregory's parents live within 8 miles of Glidden and that his extended family also lives nearby. Paisley would also benefit from slightly smaller class sizes in the Glidden schools as compared to the Waverly schools. As compared to Natalie's apartment in Lincoln, Gregory's home in Glidden provides more space for Paisley to play and "run around." Gregory also mentioned having pets, which Paisley enjoys playing with. As of the time of trial, Gregory had not explored employment opportunities in Nebraska. He testified that he could not move due to his current and future work on the family farm.

Evidence was produced during trial that showed Natalie and Gregory started dating in May 2015. Natalie had considered the possibility of marrying Gregory and moving to Glidden prior to the court's order dated August 23, 2016. In particular, Natalie sent Brandon a letter stating that Gregory would be unable to move to Waverly and that her hope was to marry him and start a family with him. At the time the letter was written,

Natalie said the idea of marriage was a possibility that was in her mind but was not yet a firm plan. She further clarified that Gregory had not at that time asked her to marry him, and she only contemplated moving away from Lancaster County if some sort of material change occurred, specifically an engagement to be married. Gregory noted that they did not discuss marriage until the spring of 2017.

Natalie acknowledged that Brandon also lives on an acreage outside of Waverly where the parties lived together for a period of time. She described Brandon as a "great dad" and noted that they communicate well. She testified that if the court denied removal, she would remain in Lincoln and would want the then-existing paternity order and parenting plan to remain in effect.

Brandon also testified about the letter received from Natalie prior to the August 2016 settlement. He acknowledged that shortly before the letter was written, he was in a long-term dating relationship with a woman who lived in Seward, Nebraska. He had told Natalie of the possibility that he might move there. However, before the parties reached their settlement agreement, he had ended that relationship in part because he did not want Paisley to have to move. Brandon understood the letter as relaying a conversation Natalie and Gregory had regarding Gregory's inability to move to Nebraska and Natalie's desire to marry him in the future. Later, in January 2017, Brandon and Natalie discussed her possible move, and Brandon said he wanted to stay involved in Paisley's daily life and "was absolutely not okay" with her relocation to Iowa. On cross-examination, Brandon acknowledged that neither Natalie nor he knew what the future held at the time the letter was written and that he understood the letter to be dependent on future events.

Brandon testified that he lives in a 1,100-square-foot house located on 6 acres outside of Waverly and is employed as a diesel mechanic. When Paisley is with Brandon, they often do chores related to raising a few calves. For recreation, they

often play outside and go fishing. On his weekends, Brandon always takes Paisley to church. With family nearby, Brandon rarely utilizes a babysitter. Brandon testified that his family lives near enough to Waverly that they usually get together to see Paisley on the weekends he has parenting time. Additionally, Brandon noted that Natalie's family lives near the Waverly area as well.

Brandon stated his concerns that there would be no way for him to remain an involved parent if Paisley were removed to Glidden, some 2½ hours away from Waverly. Accordingly, Brandon requested custody of Paisley if Natalie were to move to Iowa. Nonetheless, Brandon acknowledged his belief that Paisley's care would not suffer if she relocated to Glidden, and he confirmed that Natalie has never tried to keep Paisley from him or harm their relationship. Both witnesses called by Brandon testified to both parties' capable and qualified parenting abilities.

While acknowledging that Natalie was a good mother, Brandon expressed concerns for Paisley if removal was granted. He noted that at times, Paisley can be "a hard one to handle" and that Natalie has called him for help to calm Paisley down. He noted that Paisley was comfortable with the current living arrangement and had friends and extended family in Nebraska. If removal was allowed, Brandon would not be able to be involved in Paisley's day-to-day activities but would be relegated to being a "weekend dad." He believed that it would be impossible to maintain the level of relationship he now enjoyed with Paisley.

Following trial, the court entered its order on November 9, 2017. The court granted Natalie's complaint to modify custody and to remove Paisley to Glidden. Joint legal custody was maintained, but Natalie was granted sole physical custody. The court awarded Brandon parenting time on alternating weekends during the school year. In the summer, the court established a "2 weeks on and 1 week off" schedule, with Brandon having the 2-week periods. Regarding holidays, the

court's previous order was modified to award Brandon parenting time every year for the Thanksgiving holiday weekend and spring break. Exchanges of Paisley were ordered to take place in Shelby, Iowa.

Finally, the court modified the amount of child support to be paid by Brandon based on the transition from joint to sole physical custody, which included a downward deviation based on travel expenses. No separate error was assigned to the child support determination outside of Brandon's claim that no modification of parenting time should occur.

Brandon now appeals.

## III. ASSIGNMENTS OF ERROR

Brandon assigns the district court erred in finding that a material change of circumstance existed which justified modification of the stipulated order of paternity to sole custody, determining that Natalie had a legitimate reason to seek removal of Paisley to Iowa, and finding that removal was in Paisley's best interests.

## IV. STANDARD OF REVIEW

[1,2] Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*.

## V. ANALYSIS

[3,4] When a parent sharing joint legal and physical custody seeks to modify custody and relocate, that parent must first prove a material change in circumstances affecting the best interests of a child by evidence of a legitimate reason to leave the state, together with an expressed intention to do so. *Bird v.*

*Bird*, 22 Neb. App. 334, 853 N.W.2d 16 (2014). Proving such an intent does not necessitate that physical custody be modified, but the intent to move illustrates the likelihood that there is a need for considering some sort of modification that would reflect the new circumstances. *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000).

[5-7] Once the party seeking modification has met this threshold burden, the separate analyses of whether custody should be modified and whether removal should be permitted necessarily become intertwined. *Id.* The question becomes whether the best interests of the child are furthered by the relocating parent's obtaining sole physical custody and moving the child out of state. *Bird v. Bird, supra*. As a practical matter, the existence of a joint physical custody relationship is likely to make it more difficult for the relocating parent to meet the burden associated with relocation. *Id*.

## 1. Material Change
### of Circumstances

Brandon argues that Natalie has failed to demonstrate a material change of circumstances not contemplated at the time the stipulated decree of paternity was entered. In oral argument, counsel for Natalie conceded that the evidence, particularly Natalie's letter, establishes that Natalie had contemplated "in the abstract" the possibility of marrying Gregory prior to reaching agreement on the 2016 stipulated order, but that marriage was only a possibility at that time and was not part of any firm plan. Natalie notes that Gregory did not ask her to marry him until her pregnancy was discovered in the spring of 2017.

[8,9] Our analysis of this issue is complicated by the tension between separate lines of cases. On one hand is *Brown v. Brown, supra*, which holds that a parent sharing joint legal and physical custody proves a material change of circumstances affecting the best interests of a child by presenting evidence of a legitimate reason to leave the state, together

with an expressed intention to do so. Under this analysis, the material change of circumstances is basically subsumed in the analysis of whether there is a legitimate reason to leave the state and an expressed intent to do so, an issue which in this case is fairly clear cut. However, changes in circumstances which were in the contemplation of the parties at the time the prior decree or order was entered do not qualify as material changes in circumstances for purposes of modifying a decree. *Desjardins v. Desjardins*, 239 Neb. 878, 479 N.W.2d 451 (1992); *McDonald v. McDonald*, 21 Neb. App. 535, 840 N.W.2d 573 (2013). In this case, it can be argued that the reason for leaving is not legitimate in that it was contemplated at the time the 2016 order granting joint legal and physical custody was entered. Under these circumstances, we find that an analysis must first be performed as to whether the stated reason for leaving was contemplated at the time the 2016 stipulated order was entered in order to then determine whether that reason is indeed a legitimate reason to leave. Stated another way, we find that if the alleged reason for a custodial parent to leave was contemplated at the time of the entry of the prior order, such reason to leave cannot be considered legitimate.

The district court in this case did not perform an analysis of this issue in the foregoing context. However, the district court squarely addressed this issue in the context of assessing the parties' motives for seeking and opposing removal. See *Farnsworth v. Farnsworth*, 257 Neb. 242, 597 N.W.2d 592 (1999). The district court found that Natalie's "marriage and pregnancy constitute a material change of circumstances which were not fully contemplated at the time of the original decree." As such, we find that the record on this point is sufficient for our review.

It is clear from the evidence that the possibility of Natalie and Gregory at some point becoming engaged and married was well known to the parties prior to the entry of the August 2016 stipulated order. Natalie's letter to Brandon also demonstrates

that at the time of its writing, both parties were involved in relationships that could lead to each of them wanting to move from Lancaster County. In particular, Natalie informed Brandon that due to Gregory's employment and his assumption of responsibility for operating his parents' farm, Gregory would not be able to leave Iowa. Therefore, if Natalie and Gregory were married at some future time, Natalie would want to move to Iowa with Paisley.

However, the evidence also demonstrates that at the time these issues were discussed, they constituted possibilities as opposed to expectations. Indeed, Brandon's relationship with his girlfriend ended. Natalie's relationship with Gregory continued, however, eventually resulting in pregnancy, a marriage proposal, and a wedding. Natalie testified that at the time the parties negotiated the stipulated order, she had to do so based on conditions as they existed at the time, since she did not know if Gregory would ever propose marriage to her. Brandon acknowledged that Natalie wrote the letter to him in response to his statements that he may be moving to Seward to be closer to his girlfriend. In his testimony, he agreed that the possibility of both parties moving in the future was hypothetical and depended on whether their current relationships developed further. He agreed that neither of them knew what the future held at the time they entered into the stipulated order of paternity.

On this record, we cannot say that the district court abused its discretion in finding that Natalie's marriage to Gregory was not fully contemplated at the time of the prior order. While the possibility of marriage existed, it was not planned or even proposed at that point in time. Consequently, Natalie negotiated with Brandon based on conditions as they stood at the time as opposed to uncertain future possibilities. As such, we cannot find that her reason to leave was contemplated to a sufficient degree to find that there was no material change of circumstances from the conditions that existed at the time the August 2016 order was entered.

## 2. LEGITIMATE REASON
### FOR REMOVAL

[10] To prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *Daniels v. Maldonado-Morin*, 288 Neb. 240, 847 N.W.2d 79 (2014). The Nebraska Supreme Court has determined that a move to reside with a custodial parent's new spouse who is employed and resides in another state may constitute a legitimate reason for removal. *Colling v. Colling*, 20 Neb. App. 98, 818 N.W.2d 637 (2012). Having found that the marriage to Gregory was not sufficiently contemplated at the time the August 2016 paternity order was entered, Natalie has demonstrated a legitimate reason for leaving the state.

## 3. BEST INTERESTS OF CHILD

[11] After demonstrating a legitimate reason for leaving the state exists, the custodial parent must next show that it is in the child's best interests to continue living with him or her. *Daniels v. Maldonado-Morin, supra*. The paramount consideration is whether the proposed move is in the best interests of the child. *Id*. There are three broad considerations ordinarily to be employed in determining whether removal to another jurisdiction is in a child's best interests: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent, when viewed in the light of reasonable visitation arrangements. *Brown v. Brown*, 260 Neb. 954, 621 N.W.2d 70 (2000).

### (a) Each Parent's Motives

[12] The ultimate question in evaluating the parties' motives is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *McLaughlin*

*v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002). In this case, we find no evidence that either party has acted in bad faith.

Natalie's primary motive in seeking removal is her desire to live with her husband, who cannot move due to his work on his family's farm. She notes that in Iowa, she would not have to work outside the home and could devote more time to Paisley and her newborn child.

Brandon opposes removal based on the close relationship he has developed with Paisley. Prior to trial, Paisley spent nearly half of her time with Brandon. Brandon wishes to maintain this level of involvement with her. He wants to remain a part of her daily life and be able to be present for her activities. This level of involvement would be impossible if removal was granted.

We find that both parents have valid reasons for and against removal of their child to Iowa. Their motives being equal, this factor does not weigh for or against removal.

### (b) Quality of Life

[13] In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the removal would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of

the custodial parent. *Boyer v. Boyer*, 24 Neb. App. 434, 889 N.W.2d 832 (2017). The list of factors to be considered in determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children should not be misconstrued as setting out a hierarchy of factors. *McLaughlin v. McLaughlin, supra.* Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id.*

### (i) Factors Favoring Removal

Both parents have been closely involved in meeting Paisley's emotional, physical, and developmental needs. Natalie has in some areas been the primary caregiver. For example, she has taken Paisley to the majority of her medical appointments. If removal were granted, Natalie would have a greater ability to meet Paisley's needs, since she would not have to work while providing care for Paisley and her younger sibling.

The third and ninth factors in the best interests determination are best examined together. Given Natalie's intention to be a stay-at-home mother, her own income will not be enhanced by the move. However, the income of the household in which she is living will be substantially higher, particularly when Gregory takes over responsibility for the family farm. Natalie will no longer have to pay rent and daycare expenses and would not have to commute between her apartment in Lincoln and her husband's residence in Iowa. However, it does appear that she could resume her career as a hair stylist in Iowa if she chose to do so or conditions demanded it.

If removal was denied, Paisley would split her time between three residences. During Natalie's parenting time, she would live in a two-bedroom apartment primarily, but would regularly go to Iowa during weekends, holidays, and summer vacation. The remainder of her time would be spent with Brandon. If removal was granted, the apartment would be eliminated and she would primarily live in the house

owned by Gregory in Iowa. As a result, she would spend 100 percent of her time living in single family residences located on acreages.

### (ii) Neutral Factors

Paisley is of a young age and did not testify as to her preference. Although there was some general testimony regarding smaller class sizes in the Glidden schools, there was no significant testimony demonstrating one location to have an educational advantage over the other. Finally, regardless of outcome, there are likely to be hard feelings between the parties. However, the evidence in this trial demonstrated that despite their differences, the parties have maintained an amicable relationship. Both parties were very complimentary of each other's parenting skills. Natalie demonstrated a strong desire to nurture and encourage a strong bond between Paisley and Brandon even with the distance that would exist between them.

### (iii) Factors Against Removal

The evidence establishes that all of Paisley's extended family lives in Nebraska and that she sees those family members on a regular basis. In addition, it is likely that the quality of relationship currently enjoyed by Brandon and Paisley will suffer given the loss of frequent contact that would be occasioned by a move to Iowa. While the parenting plan attempts to restore time lost during the school year with extra time in the summer, the bottom line is that the day-to-day ability of Brandon to remain involved and active in Paisley's life is diminished.

### (iv) Quality of Life Conclusion

The district court concluded that as a whole, the quality of life factors weighed heavily in favor of removal. In our view, these factors are very close. However, based on our standard of review, we cannot say that the district court abused its discretion in reaching its conclusion.

(c) Impact on Noncustodial Parent's
Contact With Child

[14-16] The third factor in the best interests determination is the impact of the move on the contact between the child and the noncustodial parent, when viewed in light of reasonable visitation arrangements. *Maranville v. Dworak*, 17 Neb. App. 245, 758 N.W.2d 70 (2008). This consideration focuses on the ability of the court to fashion a reasonable visitation schedule that will allow the noncustodial parent to maintain a meaningful parent-child relationship. *Id*. Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Id*. Of course, the frequency and the total number of days of visitation and the distance traveled and expense incurred go into the calculus of determining reasonableness. *Id*. Indications of the custodial parent's willingness to comply with a modified visitation schedule also have a place in this analysis. *Id*.

There will be an impact from the move on the contact between Brandon and Paisley. Brandon will no longer enjoy the frequent in-person contact that he has enjoyed to this point in Paisley's life. He will not be able to share in her day-to-day life to the extent that would be possible if removal was denied. The district court noted in its analysis that Paisley would have to travel to and from Iowa frequently, regardless of the decision on removal. The court further noted that Brandon would receive significant parenting time in the summer and on holidays. The court also noted Natalie's intent to allow extra time to Brandon when she travels to Nebraska to see family.

We agree with the district court's confidence that the parties will both strive to preserve and develop the relationship between father and daughter despite the distance between them. However, we must conclude that this relationship will not be of the same quality and depth that could occur were removal denied.

### (d) Best Interests Conclusion

Removal cases rank among the most difficult decisions that a district court or a reviewing court is required to make. In this case, both parents have demonstrated their dedication to Paisley both in their testimony and their cooperative effort to provide her a safe and secure childhood. The district court concluded overall that Paisley's interests would be best served by allowing removal. Reasonable minds may differ with the court's conclusion. However, we are constrained by our standard of review. We recognize that the district court had the opportunity to see and hear the testimony of the parties. As such, we cannot find that the district court abused its discretion in concluding that Natalie's request for removal should be granted. We therefore affirm the decision of the district court.

## VI. CONCLUSION

The district court did not abuse its discretion in granting Natalie's request to modify physical custody and remove Paisley to Iowa.

Affirmed.