IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

BROWN V. MCDONALD

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

HANNAH E. BROWN, APPELLANT,

V.

MIKE D. MCDONALD, APPELLEE.

Filed August 27, 2019.    No. A-18-1115.

Appeal from the District Court for Richardson County: JULIE D. SMITH, Judge. Affirmed.

Jessica D. Meyer, of Nester & Mercure Attorneys at Law, and Kathy P. Knickrehm for appellant.

Diane L. Merwin, of Fankhauser, Nelsen, Werts, Ziskey & Merwin, P.C., L.L.O., for appellee.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

RIEDMANN, Judge.

## I. INTRODUCTION

Pursuant to a modified parenting plan, Hannah E. Brown and Mike D. McDonald shared joint legal and physical custody of their minor child. Hannah subsequently sought to modify the parenting plan and remove the minor child from Nebraska to South Carolina. The district court for Richardson County denied her request for removal. Hannah appealed. For the reasons set forth herein, we affirm.

## II. BACKGROUND

Hannah and Mike are the biological parents of River, born in 2013. The parties agreed to a parenting plan in 2014 in which they would share joint legal and physical custody of River. The parenting plan was flexible and allowed Mike to have at least 10 days of parenting time per month,

- 1 -

as well as 2 weeks of uninterrupted visitation with River in the summer. The district court adopted the agreed upon parenting plan in May 2014.

In December 2017, the parties voluntarily modified the parenting plan and adopted a week-on/week-off parenting schedule, where each parent had custody of River for a week at a time. The district court adopted the parties' parenting plan in an order for modification. In August 2018, Hannah filed a complaint to modify the parenting plan, and sought sole legal and physical custody of River and permission to remove River to South Carolina. She alleged that a material change of circumstances had occurred in that she was engaged to be married to Brian Voss and would be relocating to South Carolina for purposes of better employment. Hannah further alleged that Mike did not adequately provide for River's daily needs and necessities, and his living arrangements were not appropriate for her. Hannah asserted that it would be in River's best interest to relocate to South Carolina.

Hannah simultaneously filed a motion for temporary custody of River and authority to remove her from Nebraska. In response to Hannah's complaint to modify, Mike filed a "cross complaint" seeking sole legal and physical custody of River. He alleged that a material change in circumstances had occurred because Hannah planned to move herself and River to South Carolina, she did not provide for River's daily needs and left her in the care of third parties the majority of her parenting time, she did not maintain stable and suitable employment, she acted erratic and unreasonable in front of River, she did not follow the court's orders regarding notification of changes in residence, and did not communicate with Mike in an effort to coparent River. He also asserted that River had been diagnosed with autism, thus requiring more consistency and stability.

In August 2018 the district court denied Hannah's motion for temporary custody of River and request to remove River from Nebraska. The court found that although Hannah had a legitimate reason for wanting to move to South Carolina, it was not in River's best interests to relocate. The court set trial for October.

At trial, Hannah presented testimony regarding her relationship with River and her move to South Carolina. Hannah testified that she married Brian in August 2018. Brian, her new husband, lived and worked in South Carolina and she moved there to be with him. She left River in Nebraska and her mother cared for her during the weeks in which Hannah had scheduled parenting time. In September, Hannah began working in South Carolina as a "support tech," and made $18 per hour. She stated there would be opportunities for advancement with her job, and she was unable to obtain a similar job in Nebraska. Prior to moving to South Carolina, Hannah was a licensed welder, and had worked as a welder in Nebraska making $14 per hour. On cross-examination, Hannah stated that she had previously worked at a job in Nebraska, at which she made $47,000 in 2015, but she quit because her work schedule made it difficult to care for River.

The town Hannah moved to in South Carolina was larger than Falls City, Nebraska, where River lived at the time of trial. Hannah asserted that the town offered many opportunities for sports and activities for River. The school that River would attend in South Carolina was a good school, according to Hannah and Brian. Additionally, Hannah's home in South Carolina would allow for River to have her own bedroom.

Hannah testified that she was involved in River's life since her birth, and took her to appointments, applied for school, signed her up for various activities, and began taking her to

counseling. Hannah also asserted that River had a close relationship with Hannah's son, and that he would move to South Carolina with her as well. Hannah and Brian both indicated that they would make it a priority that Mike maintained contact and a relationship with River, and would allow him to video chat or call River daily. Hannah's proposed parenting plan allowed Mike one weekend a month of parenting time, and the entire summer with River.

While Hannah was in South Carolina, her mother was caring for River during her parenting time. Hannah's son was also in her mother's care while they waited for a daycare position to open up for him in South Carolina. Hannah's mother stated that she was looking into making retirement plans in the next 4 years, and may move closer to Hannah in South Carolina. Hannah admitted that she does not have any extended family in South Carolina.

There was conflicting testimony at trial regarding the necessity of autism treatment for River. River was diagnosed with level one autism in May 2018 by a psychologist who met with her twice, once for an initial diagnostic interview and once for a diagnostic assessment. The psychologist spent a total of less than 2 hours with River. She testified that in making her diagnosis she relied, in part, upon information from Hannah and from River's school, although the school did not note any impairment or concern.

After being diagnosed with autism, River began meeting with a therapist. Before she moved to South Carolina, Hannah attended most of the therapy sessions, whereas Mike brought River to only a few sessions. After Mike failed to bring River for three sessions, the therapist scheduled sessions only during Hannah's parenting time. The therapist testified that Hannah was very engaged in River's treatment, but Mike's involvement was low. According to her, Mike denied that the behavioral concerns that Hannah had regarding River ever occurred when River was with him. The therapist explained the type of treatment recommended for River and admitted on cross-examination, that there are schools and therapists in Nebraska that can provide the recommended treatment.

In contrast, Mike adduced testimony from River's previous teacher, who did not have any concerns with River's development or behavior. The teacher testified that River's behavior was normal compared with the other children, River did not have any unusual lack of eye contact with children or adults, and she would have conversations with the other children. Additionally, River's former daycare provider testified that she was not concerned with River's development or behavior, and that she would socialize with the other children at daycare.

Mike asserted that he was not involved with River's assessment or her diagnosis of autism because Hannah did not inform him prior to the assessment. His subsequent request to provide an information form similar to the one submitted by Hannah was denied by the therapist. Mike further testified that he did not observe the same problems with River that Hannah did, and he did not feel that it was necessary for River to begin therapy. However, despite disagreeing with the need for therapy, Mike indicated that he was willing to work with River's diagnosis and continue her therapy.

Mike's wife testified that Mike has a close relationship with River. He was involved in River's activities, and he attended her parent/teacher conferences. He also was involved in and attentive to River's medical needs. While Mike lived in an apartment with his wife, son, two stepsons, and River at the time of trial, he was actively looking into buying a house.

Mike testified that it would "kill him" to not be able to see River if she moves to South Carolina. Mike also believed that it would be unhealthy for River to lose the amount of family that she has in Falls City. He testified that Hannah has moved three or four times since 2016, and did not notify him in advance of her move. Additionally, Hannah had informed him numerous times in the past that she was moving out of Nebraska but never followed through with the move. Therefore, Mike did not believe her when she first said that she was moving to South Carolina in May 2018.

Following the close of the evidence, the district court ruled from the bench. The court found that Hannah's marriage constituted a legitimate reason to move to South Carolina. The court stated that Hannah did not show that she has a job opportunity which could not be replicated in Nebraska. It further found that Hannah is capable of earning a similar income in either state. While Hannah's house in South Carolina is nicer than Mike's, Mike was residing in the apartment in December 2017 when the parties agreed to expand parenting time to a week-on/week-off schedule.

Additionally, the court indicated it was not convinced about River's diagnosis of autism because the psychologist met with her for only 1 hour 45 minutes, Hannah provided most of the information, the school did not see any developmental issues with River, and Hannah sought the diagnosis after she decided she was moving to South Carolina.

The court noted that although Hannah and her husband make more money than Mike, that fact is not dispositive. The court found that there are not any educational advantages in South Carolina, and River has lived her entire life in Falls City, and does not have any extended family in South Carolina. It stated that even a generous parenting time situation would be insufficient to lessen the impact on the relationship between River and Mike.

The court found that Hannah's marriage to Brian and move to South Carolina was a material change in circumstances, but denied Hannah's request to remove River from Nebraska. It modified the parenting plan, giving Mike primary physical custody of River with parenting time to Hannah. Hannah timely appealed the court's decision denying her request for custody and to remove Hannah from Nebraska, but did not appeal the court's modification of the parenting plan in the event we affirm the denial of removal.

## III. ASSIGNMENTS OF ERROR

Hannah assigns, restated, that the district court erred in denying her request for physical custody of River and permission to remove her to South Carolina.

## IV. STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013). An abuse of discretion occurs when the trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *In re Change of Name of Whilde*, 298 Neb. 510, 904 N.W.2d 707 (2017). When the evidence is in conflict, an appellate court considers, and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Hiller v. Hiller*, 23 Neb. App. 768, 876 N.W.2d 685 (2016).

## V. ANALYSIS

Hannah asserts that the district court erred in denying her request for physical custody of River and permission to remove her to South Carolina. We disagree.

We begin our analysis by setting forth the general propositions of law that apply to modifications of child custody and requests for removal, followed by the specific propositions that apply in cases where the parent seeking removal is not the sole custodial parent, but instead, shares joint legal and physical custody with the other parent. Ordinarily, custody of a minor child will not be modified unless there has been a material change of circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). The party seeking modification of child custody bears the burden of showing a change in circumstances. *Id.*

In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *Bird v. Bird*, 22 Neb. App. 334, 853 N.W.2d 16 (2014). After clearing that threshold, the custodial parent must also demonstrate that it is in the child's best interests to continue living with him or her in the new location. *Id.*

The application of these standards is slightly different in cases where, as here, the parent seeking removal does not have sole custody. When a parent sharing joint legal and physical custody seeks to modify custody and relocate, that parent must first prove a material change in circumstances affecting the best interests of a child by evidence of a legitimate reason to leave the state, together with an expressed intention to do so. *Id.* Proving such an intent does not necessitate that physical custody be modified, but the intent to move illustrates the likelihood that there is a need for considering some sort of modification that would reflect the new circumstances. *Id.* Thus, the material change in circumstances is basically subsumed in the analysis of whether there is a legitimate reason to leave the state and an expressed intention to do so. *Speers v. Johns*, 26 Neb. App. 889, 923 N.W.2d 777 (2019).

Once the party seeking modification has met this threshold burden, the separate analysis of whether custody should be modified and whether removal should be permitted necessarily become intertwined. *Bird v. Bird, supra*. The question becomes whether the best interests of the child are furthered by the relocating parent's obtaining sole physical custody and moving the child out of state. *Id.* As a practical matter, the existence of a joint physical custody relationship is likely to make it more difficult for the relocating parent to meet the burden associated with relocations. *Id.*

### 1. LEGITIMATE REASON TO LEAVE STATE

The district court found that Hannah had a legitimate reason for leaving the state. On appeal, neither party assigns error to this determination. However, the Nebraska Supreme Court has held that the threshold question of whether a party seeking removal has a legitimate reason to leave the state must be analyzed first, before considering whether removal is in the child's best interests. See *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000). Yet, the Supreme Court has also declined to address whether there was a legitimate reason for relocation because its holding on best interests was dispositive. See *Steffy v. Steffy*, 287 Neb. 529, 843 N.W.2d 655 (2014). See, also, *Bird v. Bird, supra* (identifying inconsistency in approaches).

Here, because this issue is not assigned as error and our analysis on best interests is dispositive of our decision to affirm the denial of Hannah's request for custody and removal, we follow the analysis set forth in *Steffy v. Steffy, supra*, and do not address whether Hannah had a legitimate reason for leaving the state. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the controversy before it. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

## 2. BEST INTERESTS OF CHILD

Whether we are considering a modification of custody or a proposed removal from the state, the paramount consideration is the best interests of the child. *Bird v. Bird*, 22 Neb. App. 334, 853 N.W.2d 16 (2014). In determining whether removal to another jurisdiction is in the child's best interests, the trial court evaluates three considerations: (1) each parent's motives for seeking or opposing the move; (2) the potential that the move holds for enhancing the quality of life for the child and the custodial parent; and (3) the impact such a move will have on contact between the child and the noncustodial parent. *Id*. We address each consideration in turn.

### (a) Each Parent's Motives

The ultimate question in evaluating the parties' motives is whether either party has elected or resisted a removal in an effort to frustrate or manipulate the other party. *Id*. Based on our review of the record, we find no evidence that either party has acted in bad faith.

Hannah's primary motive in seeking removal is to unite her family in South Carolina. Mike's motive in opposing River's relocation is his desire to maintain a close relationship with her, and for her to maintain her close ties to her extended family in Nebraska. We find no indication in the record that Hannah sought to relocate to South Carolina to frustrate or manipulate Mike, nor that Mike opposed the relocation to frustrate Hannah. Thus, we find that the motives of each party are equally balanced.

### (b) Quality of Life

In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the children and the parent seeking removal, a court should consider the following factors: (1) the emotional, physical, and developmental needs of the children; (2) the children's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the children and each parent; (7) the strength of the children's ties to the present community and extended family there; and (8) the likelihood that allowing or denying the move would antagonize hostilities between the two parties. *Bird v. Bird, supra*. This list should not be misconstrued as a setting out a hierarchy of factors. *Id*. Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id*.

### *(i) Emotional, Physical, and Developmental Needs*

The district court found that evidence regarding River's emotional, physical, and developmental needs weigh in favor of Mike's position resisting her relocation. This determination appears to be premised on the fact that the district court was not convinced about River's autism

diagnosis. The record supports the court's skepticism. River was diagnosed with level one autism after meeting with a psychologist for under 2 hours. Moreover, only Hannah and River's school provided information to the psychologist about River's behavior, not Mike. Neither River's former teacher nor former daycare provider had any concerns about River's behavior. Mike also stated that he did not believe River had autism; however, he testified that he would continue with her therapy. If River does have autism, the record indicates that there are treatment options available in Nebraska.

Beyond River's questionable autism diagnosis, both parents testified that they adequately care for River and provide for her needs. Upon our review of the record, the district court's determination that River's emotional, physical, and developmental needs weigh in favor of denying removal is supported by competent evidence, and thus is not an abuse of discretion. We therefore find that this factor weighs against removal.

### (ii) Child's Preference

River did not testify, therefore this factor does not weigh for or against removal.

### (iii) Enhancement of Income and Employment

Another factor to consider is whether Hannah's income or employment will be enhanced with a move to South Carolina. Here, the district court found she is capable of earning similar incomes in both Nebraska and South Carolina. The record supports this finding. Hannah testified that her employment in South Carolina pays her $18 per hour. However, the evidence also demonstrates that Hannah worked at previous jobs in Nebraska earning $14 per hour and up to $47,000 per year. Therefore, we find that Hannah was capable of earning a similar income in Nebraska.

On appeal, Hannah asserts that the district court failed to consider that her work hours in South Carolina were more conducive to family life. However, while Hannah did testify that the hours she worked at her employment in Nebraska were not conducive to raising a family, we do not find sufficient evidence in the record indicating that she could not find employment with better hours or more flexibility. .

Hannah also asserts that she and Brian earn more money in South Carolina and that this fact should be considered and given weight. A custodial parent's income can be enhanced because of a new spouse's career opportunities, for purposes of determining the potential that removal of children to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children. *Colling v. Colling*, 20 Neb. App. 98, 818 N.W.2d 637 (2012). However, we find insufficient evidence to support a finding that Brian's career opportunities enhanced Hannah's income. Brian testified that prior to moving to South Carolina, he was employed in Auburn, Nebraska in the nuclear industry. He left that job because he was going to be transferred to the company's corporate office in Mississippi. He chose, instead to accept employment in South Carolina because that job offered him more flexibility to return to Nebraska for parenting time with his own children. He began work with his present employer in March 2017 and currently earns approximately $12,200 per month.

There was no testimony regarding Brian's salary in Auburn, or whether there were similar employment opportunities for him in Nebraska. We find nothing in the record to support a finding

that the position in South Carolina provided better career opportunities for Brian than he had in Nebraska.

Because we find that Hannah is capable of earning a similar salary in Nebraska as she earns in South Carolina, and the evidence is insufficient to support a finding that her salary is enhanced by Brian's career opportunities in South Carolina, this factor does not weigh in favor of relocation.

### (iv) Housing and Living Conditions

The evidence presented at trial demonstrates that Hannah's home in South Carolina is likely nicer than Mike's apartment in Nebraska. At the time of trial, Mike was living in an apartment with his wife, biological son, two stepsons, and River during his parenting week. However, the evidence shows that he was actively looking for a larger home. Further, the parties amended the parenting plan in December 2017 to allow for each parent to have a full week of parenting time. At that time Mike was living in the apartment, and Hannah found it suitable for River to reside there. However, given the evidence presented at trial that River would have her own bedroom in South Carolina and the close quarters in which Mike and his family were living at the time of trial, we find this factor weighs slightly in favor of relocation if Hannah were granted sole custody.

### (v) Educational Advantages

At the time of trial, River was 5 years old and attended preschool. Hannah and Brian both testified about the quality of the school she would attend in South Carolina. However, the district court found that Hannah failed to show that there are educational advantages in South Carolina. We find no competent evidence indicating that the schools in Nebraska are inferior to those of South Carolina. The existence of educational advantages factor receives little or no weight when the custodial parent fails to prove that the new schools are superior. *Boyer v. Boyer*, 24 Neb. App. 434, 889 N.W.2d 832 (2017). Thus, this factor is neutral in our analysis.

### (vi) Quality of Relationship Between Child and Parents

The district court did not address this factor in its analysis. Upon our de novo review of the record, we find that both parents have a loving and positive relationship with River, and both have provided quality care for her. Although Hannah argues on appeal that she was primarily responsible for setting up River's therapy sessions, as we iterated above, the district court did not abuse its discretion in its skepticism of River's autism diagnosis. Thus, the fact that Hannah began River in therapy does not indicate that she had a stronger relationship with River than Mike did. We therefore find this factor to be neutral.

### (vii) Ties to Community and Extended Family

The record indicates that River has lived her entire life in Nebraska. River has extended family in Nebraska, including Hannah's mother, who provided significant care for River. The record further indicates that River does not have any family or ties to South Carolina beyond Hannah, and Hannah's biological son, who was still living in Nebraska at the time of trial. Hannah argues on appeal that her mother was considering moving to South Carolina after her retirement. However, her mother testified that she was looking into making retirement plans "maybe in the

next four years." Based on the strong ties River has to Nebraska, and the amount of family she has in the area, this factor weighs heavily against relocation.

### (viii) Hostilities Among Parents

The district court did not address this factor in its analysis. While Hannah and Mike disagreed over River's autism diagnosis, we find that they have generally been able to put their differences aside and coparent River. Despite their disagreements, both parents, and Brian, testified that they would do all they could to continue to foster a relationship between River and the noncustodial parent, regardless of which way the court ruled. We therefore find this factor to be neutral.

### (ix) Quality of Life Conclusion

The majority of the factors considered were neutral in determining whether River's qualify of life might be improved by living in South Carolina. There were primarily two factors weighing against relocation. First, the district court was not convinced of River's diagnosis of autism, and the dubious nature that Hannah used to obtain that diagnosis; thus, River's emotional, physical, and developmental needs favor her remaining in Nebraska. Second, River has lived her whole life in Nebraska and has strong family ties to the area. At the time of trial, she did not have any family residing in South Carolina except for Hannah. After considering each of the factors relating to River's quality of life, we conclude that Hannah has not shown that the quality of life would be improved for River by the move to South Carolina.

### (c) Impact on Noncustodial Parent's Visitation

The final consideration in the best interests analysis is the impact such a move will have on contact between the children and the noncustodial parent. This effect must be viewed in light of the court's ability to devise reasonable visitation arrangements. *Bird v. Bird*, 22 Neb. App. 334, 853 N.W.2d 16 (2004). Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Id*. The frequency and the total number of days of visitation and the distance traveled and expense incurred go into the calculus of determining reasonableness. *Id*. The determination of reasonableness is to be made on a case-by-case basis. *Id*.

Here, the district court noted even a generous parenting schedule for Mike would be insufficient to lessen the impact on his relationship with River. The record supports the district court's findings. It is clear that Mike and River have a strong relationship. Under Hannah's proposed parenting plan, Mike would be allowed one weekend a month of parenting time, and all of River's summer break. However, even under this plan, Mike would receive significantly less parenting time than he was receiving at the time of trial with the week-on/week-off schedule. Further, although Hannah testified that she would allow Mike to call or FaceTime daily with River, she acknowledged that it was difficult to talk to River on the phone due to her age. Thus, we find that the district court did not abuse its discretion in finding that even a generous parenting schedule for Mike would not lessen the impact River's relocation would have on his relationship with her.

After considering all relevant factors, we conclude that the district court did not abuse its discretion in denying Hannah's request for modification of physical custody and permission to

remove River to South Carolina. Because Hannah does not assign as error the court's modification of the parenting plan, we do not address the new parenting schedule entered by the court.

## VI. CONCLUSION

The district court did not abuse its discretion in denying Hannah's request for physical custody and to remove River from Nebraska, as it was not in River's best interests to do so. We therefore affirm.

AFFIRMED.