Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/26/2020 09:07 AM CDT

Jared L. Fichtl, appellee, v.
Joey W. Fichtl, appellant.

___ N.W.2d ___

Filed May 19, 2020.    No. A-19-203.

1. **Child Custody: Appeal and Error.** Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion.

2. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

3. **Child Custody: Appeal and Error.** In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

4. **Modification of Decree: Child Support: Appeal and Error.** Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court. The same standard applies to the modification of child support.

5. **Modification of Decree: Child Custody: Proof.** Prior to the modification of a child custody order, two steps of proof must be taken by the party seeking the modification. First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests.

6. **Modification of Decree: Words and Phrases.** A material change of circumstances constituting grounds for modification of a dissolution decree means the occurrence of something which, had it been known

to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.

7. **Child Custody.** Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action.

8. ____. While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration.

9. **Modification of Decree: Proof.** The party seeking modification of a parenting plan has the burden to show a material change in circumstances and that such modification is in the children's best interests.

10. **Modification of Decree: Child Support: Proof.** A party seeking to modify a child support order must show a material change in circumstances that (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered.

11. **Modification of Decree: Child Support.** Courts may consider various factors to determine whether a material change of circumstances has occurred. Among the factors to be considered are (1) changes in the financial position of the parent obligated to pay support, (2) the needs of the children for whom support is paid, (3) good or bad faith motive of the obligated parent in sustaining a reduction in income, and (4) whether the change is temporary or permanent.

12. **Courts: Child Support.** The trial court has discretion to choose whether and how to calculate a deduction for subsequent children.

13. **Modification of Decree: Child Support: Proof.** The party requesting a deduction for his or her obligation to support subsequent children bears the burden of providing evidence of the obligation, including the income of the other parent of the child.

14. **Equity: Modification of Decree: Child Support: Time.** Absent equities to the contrary, the general rule is that the modification of a child support order should be applied retroactively to the first day of the month following the filing day of the application for modification.

15. **Child Support: Child Custody.** In the determination of child support, the children and the custodial parent should not be penalized for delay in the legal process, nor should the noncustodial parent gratuitously benefit from such delay.

Appeal from the District Court for Douglas County: THOMAS A. OTEPKA, Judge. Affirmed as modified.

Adam E. Astley, of Astley Putnam, P.C., L.L.O., for appellant.

Benjamin M. Belmont and Wm. Oliver Jenkins, of Brodkey, Cuddigan, Peebles, Belmont & Line, L.L.P., for appellee.

Pirtle, Riedmann, and Welch, Judges.

Pirtle, Judge.

## I. INTRODUCTION

Joey W. Fichtl, now known as Joey W. Hansen, appeals from an order of the Douglas County District Court denying her application for modification of a previously entered decree of dissolution in regard to child custody and parenting time and granting the counterclaim of Jared L. Fichtl to modify the decree in regard to child support. Based on the reasons that follow, we find that the district court did not abuse its discretion in declining to modify child custody and parenting time and in modifying Joey's child support obligation. However, we find that the district court erred in calculating Jared's monthly income. Accordingly, we affirm the district court's decision regarding modification and modify the portion of the decree concerning child support.

## II. BACKGROUND

Joey and Jared were married in 2003 and are the parents of three minor children: Kalilee Fichtl (Kali), born in 2002; Liberty Fichtl (Liby), born in 2004; and Trapton Fichtl (Trapper), born in 2008. The parties divorced in 2012 and entered into a consent decree whereby they shared legal custody; Jared was granted physical custody and final decision-making in the event that the parties disagreed on religious, medical, or educational decisions; and Joey received certain parenting time. Trial regarding Joey's application to modify and Jared's counterclaim took place on May 4, 2017, and April 4, 2018. The district court entered an order of modification on May 31, denying Joey's request to modify custody and granting Jared's request for child support. On December 18, the court heard Joey's motion to alter or amend the order of

modification. That motion was denied on January 28, 2019. This appeal followed.

At trial, Joey testified that the initial parenting plan was drafted by Jared's attorney and that Jared had indicated to her they would be able to "split a lawyer." Joey testified that at the time she signed the parenting plan, Jared indicated they "would never follow it," and that the two subsequently did not follow its terms after it had been entered by the court. Joey and Jared initially followed an informal routine, where Joey would see the children when she was not scheduled to work. She testified that at the time the parenting plan was entered, in July 2012, she had contemplated pursuing further education, but was undecided at the time. Joey applied for, but was not initially accepted into, a medical school program in Grenada to begin in the fall of 2012.

Joey testified that when she brought up her plan to pursue an education in Grenada and their arrangement with visiting the children, Jared called her an "idiot" for signing the parenting plan and stated that they were going to start following the plan entered by the court. Joey moved to Grenada in August 2012. She testified that she would return to Nebraska for several months to see the children when she had breaks in her educational requirements in Grenada. Despite her requests for more parenting time, Jared would refuse and adhere to the parenting plan previously entered by the court.

Joey testified that she made several attempts to call or "Skype" with the children, but she would not get an answer or would be met with excuses from Jared that he "couldn't get it set up." In 2014, Joey made the decision not to return to school in Grenada due to her father's ill health. Instead, Joey completed her master's degree in nursing and continued to apply for medical programs in Nebraska. Joey worked as a nurse and made arrangements to live in Omaha, Nebraska, in December 2014.

Joey testified that prior to filing the application to modify, she experienced difficulties getting ahold of the children and

implementing aspects of the original parenting plan. After returning to Nebraska, Joey sought to have more time with the children than provided for under the original parenting plan. Joey testified that she was requesting that Jared no longer have the "final say" on education and health decisions for the children due to ongoing difficulties she experienced related to those issues.

Joey testified that at one point, Jared indicated Kali had started counseling and he had not discussed this with Joey beforehand despite the two sharing joint legal custody of the children. According to Joey, Jared would also sign the children up for activities without first consulting her and would not tell her about practices or games. There were several incidents where Joey tried to attend school events with the children, but Jared would tell her not to do so.

Joey also discovered that she was not listed in the school directory, nor with the children's doctor and dentist, as the children's mother for contact purposes. Joey testified that Jared would not communicate with her regarding the children's appointments. Joey testified that the police had to intervene to enforce her parenting time on at least three occasions.

Joey testified that she had a meeting scheduled with Kali and Trapper's therapist, Sarah Wemhoff-Strawn (Strawn), but that when she reached out to confirm the meeting, she was told Strawn was out of the office that day. Joey testified that she did not make any further efforts to meet Strawn again because both Jared and Kali told her not to attend the counseling sessions. She further testified that she was not aware of any trust or other issues Kali was having with her prior to hearing Strawn testify about them. Joey indicated that she would be willing to participate in therapy sessions in order to build a stronger relationship with Kali.

Joey testified that when the children are at her home, she will coordinate activities with them such as playing soccer, watching movies, and going to places such as the library. Joey testified that she has remarried and lives with her husband,

Lee Hansen (Lee), and that their home is large enough for each child to have his or her own room when visiting. Joey testified that the children have a "great relationship" with Lee and that he is supportive of all the children's activities.

Joey testified that if she were awarded equal parenting time, she would reduce her work hours and likely work only one job. She testified that she earned a lump sum of $6,500 for teaching a course between January and May of 2017. At her job with Methodist Health System, Joey worked four 12-hour shifts per month and earned $2 per hour when on call and $43 per hour when required to go in. Joey also worked at CHI Health Immanuel, where she worked three 12-hour shifts per week, earning $31.64 per hour. Joey testified that under the original parenting plan, the children remained on her health insurance through her employment.

On cross-examination, Joey denied ever talking negatively about Jared or his current wife, Maggie Fichtl, although she admitted Jared was listed in her cell phone contacts as "'asshole'" when she and Jared first separated. She denied ever keeping the children from contacting Jared when they were staying with her.

Joey testified that she was aware when she moved to Grenada that she would not see the children "every other weekend and one day during the week," as provided for under the original parenting plan. She testified that when she returned from Grenada, Jared requested her work schedule, and that she would sometimes give it to him, but did not want him "showing up" at her place of employment. She acknowledged that all three of the children have done very well in school; are in good health; and, for the most part, do well socially.

Strawn provided counseling services for Kali for approximately 1 year leading up to trial. Kali was brought in to see Strawn due to concerns that Kali was having difficulty expressing emotion and was stressed about her relationship with Joey. Strawn testified that Kali told her that she had a difficult time trusting Joey and that Kali felt Joey left abruptly, often does

not follow through with things, and places her in the middle of arguments between Joey and Jared. Kali also has expressed that she feels that Joey puts her in the middle of her relationship with Liby, where Kali feels she has to defend Liby. Strawn testified that Kali has indicated that she gets anxious visiting Joey and that she does not enjoy visiting her. Strawn testified that since beginning their sessions, Kali has grown in her ability to process and express emotions, although there is continued tension between her and Joey.

Strawn testified that Kali indicated that her trust of Joey might grow if Joey did not speak poorly about Jared and his wife, Maggie, and if she would begin to follow through on things. Strawn testified that she does not believe spending more time together would improve the relationship between Kali and Joey at this time.

Strawn testified that she also began to treat Trapper about 4 months before trial. Trapper initially had difficulty expressing emotions and displayed some behavioral issues at school. Strawn testified that since her time seeing Trapper, he has "opened up a little bit more" and enjoys spending time at both Joey's home and Jared's home.

On cross-examination, Strawn testified that tension between a teenage daughter and her mother is common at Kali's age. Strawn testified that although she feels spending time with each other would help the trust issues between Kali and Joey, that relationship should not be forced. Strawn recalled that when her sessions with Kali first began, Joey had contacted her in order to discuss the issues Kali was having, but there was a scheduling conflict. She testified that she has not spoken to Joey regarding any of the issues being discussed in her counseling sessions with the children due to client confidentiality. She also stated that Kali was adamant that she did not want counseling sessions to include her mother.

The court conducted an in camera interview with two of the minor children, Kali and Liby. Kali testified that she lives with her father, stepmother, three siblings, and their dog. She

noted that she enjoys living there and has no concerns. She testified that she gets along with her stepmother, Maggie, and that they will do things together, such as attend concerts. She testified that she also gets along with Jared and her siblings and that they will spend time together as a family. Kali noted that her stepsister was adopted by Jared but that Kali considers her to be "like [her] real sister."

Kali described her relationship with Joey as having been "kind of rocky a little bit" for the 2 years or so leading up to trial. She testified that she was "fine" with her current visitation schedule with her mother, but that she would not mind if it was less time. She testified that she is comfortable talking with Jared if something is bothering her but that she is not really comfortable talking to Joey.

Kali testified that her stepfather, Lee, who is Joey's husband, is "really nice" and will usually be at the home when she visits. She testified she has never heard Jared say anything negative about Joey, but has heard Joey say negative things about Jared on multiple occasions.

Kali testified that she has chores and that rules are in place when she is at Jared's home, but there are not really any similar rules in place at Joey's home. She testified that they usually do not make plans together while at Joey's. Kali was unable to say what her mother's relationship is like with Trapper, but noted that Joey and Liby do not really get along. Kali noted that she feels "kind of . . . unsafe" at Joey's, but was unable to explain why.

Liby referred to her mother as "Joey" and testified that she does not really get along well with her. Liby testified that she knows Joey does not really like her because Joey told her so. She testified that Joey told her and Kali that they both are a "disappointment." Liby testified that she and her mother have not really gotten along since her mother returned from Grenada. Liby testified that she believes that under the current visitation schedule, she sees her mother too often. She noted that she and Kali usually stay in their room when visiting Joey

and that they do not do much while there. She testified that she would like to see Joey "[m]aybe once a month." She testified that prior to the time leading up to trial, Joey would not call the children very often while they were at Jared's.

Liby testified that she has not heard Jared say anything negative about Joey, but that Joey will say negative things about Jared's wife, Maggie, including "[b]ad words." She testified that Joey told her and her siblings that they were not allowed to talk about Jared anymore. Liby testified that she is not really comfortable talking to Joey about her problems, but would if she had to. She testified that Joey's home is "super big" and that sometimes it "scares" her.

The second day of trial proceedings did not occur until 11 months later, on April 4, 2018. The proceedings resumed with the continued cross-examination of Joey. Joey was unable to produce documentation to support her testimony that she was not listed as the children's mother for contact purposes nor specific emails where Jared told her she was not allowed to volunteer at the children's school.

Joey admitted that she and Jared do not communicate effectively and sometimes disagree on decisions regarding the children. Joey testified that she and Jared originally agreed that neither of them would pay child support and that the two would split costs for the children "50/50." She acknowledged that she probably owed Jared some money for expenses, but disputed the exact dollar amount. She testified that, at the time, her only source of income was CHI Health Immanuel, but that for the previous tax year, 2017, she had income from teaching a course and from Methodist Health System.

On redirect examination, Joey testified that since the previous trial date, she gave birth to another child. She testified that she took 12 weeks of maternity leave, which required her to use her initial 40 hours of paid time off, and that she then was compensated 60 percent of her $32-per-hour base pay. Joey testified that in order to spend time with her new child and the other children, she would reduce her hours to work

the minimum 4 days per month and pick up additional shifts as needed. She testified that she previously provided health insurance for the children through her employer, but that was changing so that it was provided through the employer of her husband, Lee.

She testified that Jared sent her receipts for some of the items he was seeking reimbursement for, but not all of them. She testified that she was not aware of Jared's reimbursing her for any of the items she sought reimbursement for.

Joey testified that since the first day of trial, she had reached out to the children's therapist, Strawn, in an attempt to meet with her regarding the children's counseling. Joey testified that Strawn referred her to another counselor to meet with for separate sessions. Joey testified that she would like Liby to receive counseling and that when she raised the issue with Jared, he would state that she does not need it.

Joey testified that between the trial dates, Liby refused to attend parenting time with her on several occasions. In response, Jared told Joey that he cannot force Liby to attend and that it is something Joey needs to work out with Liby. Joey testified that she and Jared split expenses for the children for medical bills, school expenses, extracurricular activities, and counseling.

After the conclusion of Joey's testimony, Jared moved to dismiss Joey's claim seeking modification of the parenting plan based on the fact that she had not met her burden of showing a material change in circumstances and/or that modification was in the children's best interests. The district court reserved ruling on the motion until the conclusion of the presentation of all evidence.

A friend and neighbor of Jared was called to testify on his behalf. She testified that she has the opportunity to see the children nearly every day in Jared's care and that they overall appear "clean and happy and social, very sociable." She described Jared's interaction with the children as "[c]aring and loving, in tune to everything they're doing and interested

in everything they're doing." She described Jared as caring, patient, and affectionate with the children. She also described Jared's wife, Maggie, as "very motherly and caring."

Jared testified that all three of his children with Joey have lived with him since they were born. Jared testified that he sends Joey an email itemizing expenses for which he is seeking reimbursement and provides receipts when they are available. He testified Joey most recently owed him around $5,900 for such expenses.

Jared testified that at the time the original dissolution decree and parenting plan was entered into, he was aware Joey would be moving to Grenada because she told him such, but she did not indicate when she would return. He testified that while Joey was in Grenada, she would not exercise her parenting time under the original plan, but would return for a month or two throughout the year.

Jared testified that when Kali first began counseling, he attempted to discuss it with Joey, but Joey would not respond whether or not she was "okay" with the counseling because she wanted to know the reason for it. Jared did not explain why counseling was necessary, because Kali had asked him not to tell Joey about it.

He indicated that he has always kept Joey informed about the children's appointments and that although Joey was not initially listed on paperwork with their dentist, she was ultimately added to it. Jared testified that he has never refused telephone contact by Joey with the children and that the two arranged a specific time for her to call, but she would not always take advantage of that time. Occasionally, weeks would go by where she did not call the children. Jared denied that the original parenting plan was not being followed immediately after the divorce.

Jared testified that he tries to foster a relationship between the children and their mother by having them in counseling and encouraging them to attend the parenting time with her. He testified that after Joey returned from Grenada, her work

schedule would occasionally require her to work Wednesdays, but he would work with her in an attempt to find an alternate time for her parenting time. He testified that despite several requests, Joey did not provide him her work schedule so that he was able to plan her parenting time around her schedule. The evidence showed that all of the children performed well in school. Jared testified that the children are in good health, do well socially, and are very close with one another and their stepsister. Jared testified that he has rules and discipline procedures for the children at home.

Jared testified that he is currently occupied in residential construction and owns 50 percent of a construction business. Evidence was introduced in the form of Jared's personal and company tax returns for the years 2013 through 2016. Jared testified that his income varies annually based on the amount of his company's business. Jared testified that his average annual income between 2013 and 2016 was $63,163. That amount included depreciation deductions from his business.

On cross-examination, Jared testified that he believes the children are "doing excellent" with the current parenting arrangement and that he does not feel the need to change it and disrupt their lives. Jared testified that in the 6 years he and Joey have been divorced, Joey has received extra parenting time with the children on two occasions. Jared testified that he would always attempt to contact Joey prior to enrolling the children in activities. He testified that although he always encourages Liby to attend her parenting time with Joey, that decision is ultimately up to the two of them. Jared denied that there were times where he and Joey would reimburse each other for expenses incurred outside of what was listed in the original divorce decree.

On May 31, 2018, the district court entered an order finding Joey had not met her burden of demonstrating both a material change in circumstances and that modification of the parenting plan would be in the children's best interests. Joey's application to modify the original parenting plan was denied and

dismissed. The district court also ordered that Joey be required to pay child support in the amount of $1,354 per month, retroactive to August 1, 2015.

On June 8, 2018, Joey filed a motion to alter or amend the court's previous order on her application for modification and Jared's counterclaim seeking child support. That motion was heard before the district court on December 18. At the hearing, counsel for Joey argued that the court's determination regarding (1) custody, (2) parenting time and parenting rights, (3) child support and reimbursement calculations, and (4) child support arrearage were contrary to the evidence produced at trial and not in accordance with Nebraska law. On January 28, 2019, the district court entered an order denying Joey's motion to alter or amend. This appeal followed.

## III. ASSIGNMENTS OF ERROR

Joey assigns that the district court erred when it (1) declined to award the parties joint physical custody and equal parenting time or, in the alternative, (2) declined to make a less significant change to the parenting plan such as ordering family therapy. She further assigns that the district court erred when it (3) ordered Joey to pay child support to Jared, (4) determined Jared's income for child support purposes, (5) used the wrong filing statuses for the parties on its child support calculation worksheet, (6) failed to give Joey credit for her subsequently born child on the child support calculation worksheet, and (7) made its child support award retroactive.

## IV. STANDARD OF REVIEW

[1,2] Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if

its action is clearly against justice or conscience, reason, and evidence. *Id*.

[3] In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

[4] Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court. The same standard applies to the modification of child support. *Roberts v. Roberts*, 25 Neb. App. 192, 903 N.W.2d 267 (2017).

## V. ANALYSIS

### 1. Custody and Parenting Plan

[5,6] Joey's first two assignments of error are based on the district court's denial of her application for modification of the parties' original decree of dissolution of marriage and parenting plan. Prior to the modification of a child custody order, two steps of proof must be taken by the party seeking the modification. First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019). Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id*. A material change of circumstances constituting grounds for modification of a dissolution decree means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Id*.

For the reasons that follow, we determine the district court did not abuse its discretion in finding Joey did not meet her burden of proof in showing both a material change in

circumstances and that a change would be in the children's best interests.

(a) Physical Custody and Parenting Time

Joey first argues that the district court erred in not awarding her joint physical custody and/or equal parenting time. We disagree. Notably, Joey's first request for joint physical custody was not made until after trial had commenced. In her application for modification, Joey sought only "a new detailed parenting plan setting forth the relative rights and obligations as related to the minor children." Notwithstanding, Joey now argues a material change in circumstances exists, warranting an award of joint physical custody and/or equal parenting time, because (1) she relied on Jared's assurances that they would not follow the parenting time provisions within the divorce decree and (2) she has returned to Omaha, where the children and Jared reside, and is now able to exercise more parenting time with the children.

The relevant parenting time provisions of the original parenting plan set forth the following:

**Parenting time Arrangements**—The parents agree to arrange liberal and reasonable parenting time as is agreed to by the parents. The parents agree to have a flexible parenting time due to work schedules of the parents. If the parents fail to agree, parenting time with the children shall be as set forth below:

**A. Weekend Parenting Time:** Mother shall have Parenting Time with the children every other weekend from 6:00 p.m. on Friday to 8:00 p.m. on Sunday the first weekend following the entry of the order.

**B. Week Day Parenting Time:** Mother shall have Parenting Time with the children every Wednesday from 5:30 p.m. to 8:00 p.m.

The Parenting Plan then sets forth provisions for holiday parenting time.

We first find no merit in Joey's contention that she has detrimentally relied on Jared's assurances they would never

follow the terms of the parenting plan and now Jared is refus-
ing to honor the informal agreement by withholding parenting
time. A material change of circumstances constituting grounds
for modification of a dissolution decree means the occurrence
of something which, had it been known to the dissolution court
at the time of the initial decree, would have persuaded the
court to decree differently. *Eric H. v. Ashley H., supra*. Even
assuming that Jared made such a promise, we cannot say that
his failure to provide liberal parenting time in accordance with
that promise is a material change in circumstances warranting
modification. In this case, the provisions of the parenting plan
specifically contemplate the possibility that Joey and Jared
may not agree on a schedule allowing liberal parenting time.
Nevertheless, the parenting plan provides for that possibility
by providing Joey with specific parenting time every other
weekend and Wednesday evenings in the event the parties
do not agree. The risk of no agreement was recognized by
the dissolution court at the time of the initial decree and was
accounted for in the parenting plan. Because the possibility
that the parties may not agree on liberal parenting time was
accounted for in the original decree, we cannot say Joey has
met her burden in showing a material change in circumstances
warranting modification. This argument fails.

Joey's primary argument for a material change in circum-
stances is that she has returned from Grenada and now is
able to exercise significantly more parenting time with the
children. Although we take this opportunity to clarify our
precedent in cases involving the modification of custody and/
or parenting time, we agree with the district court that Joey
has not satisfied her burden of showing a material change
in circumstances.

In her brief, Joey takes issue with the district court's reli-
ance on this court's opinion in *McDonald v. McDonald*, 21
Neb. App. 535, 541, 840 N.W.2d 573, 582 (2013), where we
held that "[c]hanges in circumstances which were within the
contemplation of the parties at the time of the decree are not

material changes in circumstances for purposes of modifying a divorce decree." We note that this court has applied this rule in other cases involving the modification of custody arrangements. See, e.g., *Speers v. Johns*, 26 Neb. App. 889, 923 N.W.2d 777 (2019) (applying rule in modification of custody and removal setting); *Hall v. Hall*, 26 Neb. App. 877, 924 N.W.2d 733 (2019) (applying rule in modification of child custody setting). However, after review of Nebraska Supreme Court precedent, we are unable to find a case that applies this definition in the modification of child custody and/or parenting time context. Rather, the use of the "contemplation of the parties" language has been limited to cases involving the modification of child support or alimony. See, e.g., *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009) (modification of child support); *Collett v. Collett*, 270 Neb. 722, 707 N.W.2d 769 (2005) (modification of alimony); *Pope v. Pope*, 251 Neb. 773, 559 N.W.2d 192 (1997) (modification of alimony). Our line of cases applying this language in the modification of child custody context have repeatedly cited to the Supreme Court's decision in *Desjardins v. Desjardins*, 239 Neb. 878, 479 N.W.2d 451 (1992), which was a case involving the modification of alimony.

We now clarify that in cases involving the modification of child custody, a material change of circumstances constituting grounds for modification means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. See, *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019); *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015); *McDougall v. McDougall*, 236 Neb. 873, 464 N.W.2d 189 (1991). To the extent *Speers v. Johns, supra*; *Hall v. Hall, supra*; *McDonald v. McDonald, supra*; and our other cases have applied the "contemplation of the parties" language to the definition of a material change in circumstances, outside of the modification of alimony and child support contexts, we expressly disapprove of that application. Nevertheless, we

find that Joey has not met her burden of establishing a material change in circumstances in this case.

There is nothing in the record to suggest that the dissolution court would have decreed differently had it known that Joey intended to depart from, and return to, the State of Nebraska. In fact, the very terms of the parenting plan suggest that her departure and intent to return were known to the dissolution court at the time of the original decree.

In its order, the district court acknowledged language of the decree, in "Addendum 1 — Financial Plan," which reads: "'CHILD SUPPORT: Neither party shall pay child support. Said deviation is due to [Joey's] intention to move to Grenada in August 2012 and uncertainty regarding her employment and income.'" This provision, along with the very terms of Joey's parenting time set forth in the parenting plan, support the fact that the change in circumstances Joey relies on in her request for modification was in fact known to the dissolution court at the time the decree was entered. As observed by the district court, "[t]he Parenting Plan set forth regular parenting time in anticipation of [Joey's] returning — every other weekend and every Wednesday evening. That schedule would only have been feasible while Joey was in Nebraska and thus contemplated at the time of the Decree." Although the district court used the language "contemplated at the time of the Decree" in its order denying modification, these provisions were contained within the original decree, which the dissolution court approved of, thereby necessitating a finding that the dissolution court knew at the time the decree was entered that Joey may be returning to Nebraska. Therefore, it cannot be said that the dissolution court would have ruled differently knowing that Joey may return to Nebraska.

Joey left Nebraska in August 2012 without having been accepted into medical school in Grenada, and she returned to Nebraska in 2014 without a medical degree. Joey acknowledged that the master's degree in nursing she had been pursuing in Grenada was something she could have completed in

Nebraska. The evidence suggests that Joey's decision to leave for Grenada, and her intention to return to Nebraska upon completion of either her or her then-boyfriend's education, is reflected within the very terms of the original dissolution decree and would have been within the knowledge of the dissolution court.

[7] Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). Here, there is no evidence that Jared has become unfit to parent the children. To the contrary, the evidence shows the children have been, and continue to be, thriving in their father's care. It was not an abuse of discretion for the district court to find that Joey did not meet her burden in showing a material change in circumstances.

[8] Briefly, we note that even if we had found a material change in circumstances, Joey has not met her burden of showing that such change is in the best interests of the children. The evidence shows that the children are happy, healthy, and thriving in their father's care. All the children are doing well in school; enjoy living with their father, stepmother, and stepsister; and are content with the current visitation schedule. In fact, both Kali and Liby testified that they would prefer less time at Joey's home than under the current parenting plan. While the wishes of a child are not controlling in the determination of custody, if a child is of sufficient age and has expressed an intelligent preference, the child's preference is entitled to consideration. *Floerchinger v. Floerchinger*, 24 Neb. App. 120, 883 N.W.2d 419 (2016) (citing *Vogel v. Vogel*, 262 Neb. 1030, 637 N.W.2d 611 (2002)).

In this case, the testimony of Strawn, the children's therapist, also supports the fact that a modification of the parenting plan providing Joey with joint physical custody, or equal parenting time, would not be in the children's best interests. While Kali and Liby should be encouraged to develop their

relationship with Joey, forcing that relationship and more time with her could do more harm than good. Overall, we find that Joey has not shown that modification of the parenting plan would be in the best interests of the children.

### (b) Less Significant Change
### to Parenting Plan

Joey next argues that the district court erred when it declined to make a less significant change to the parenting plan, such as ordering family therapy. We disagree. Joey argues that despite her request for joint physical custody or equal parenting time, the district court "had an independent duty to safeguard the best interest of the children," and that if it found joint physical custody was an inappropriate remedy, "then it should have considered what other remedial actions would have been available." Brief for appellant at 24-25.

[9] Joey cites no supporting authority for the premise that a district court has an obligation to consider alternative modifications to an original parenting plan not requested in the moving party's application for modification. As the party seeking modification, Joey had the burden to show a material change in circumstances and that such modification is in the children's best interests. See, e.g., *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015). In its order, the district court specifically found that Joey had not met her burden under either prong. It was not an abuse of discretion for the district court to leave the original parenting plan intact without modification. This argument fails.

### 2. CHILD SUPPORT

Joey next makes a number of arguments regarding the district court's order requiring her to pay child support. While Joey initially argues that she should not be required to pay child support in any amount, she also takes issue with the district court's calculations and retroactive date of the award. We address each of Joey's assignments of error in turn related to her obligation to pay child support.

### (a) Order to Pay Child Support

Joey first argues that the district court erred by finding a material change in circumstances did not exist for purposes of modification of custody, but simultaneously found that a material change in circumstances did exist for purposes of modification of child support. Joey contends that the same underlying facts, her return to Nebraska from Grenada, should lead to the same conclusion regarding whether or not a material change in circumstances exists. We disagree.

[10] A party seeking to modify a child support order must show a material change in circumstances that (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). Here, Jared has met the burden under his counterclaim for child support to show a material change in circumstances not contemplated when the decree was entered. In "Addendum No. 1 Financial Plan" of the decree, the following provision addresses the obligation of child support:

> 1. **CHILD SUPPORT:** Neither party shall pay child support. Said deviation is due to [Joey's] intention to move to Granada [sic] in August 2012 and uncertainty regarding her employment and income. [Joey] has agreed to pay additional expenses for the minor children. [Jared] has the financial resources to support the minor child and believes that this deviation is in the best interest of the minor children of the parties.

Based on this provision, it is not Joey's return to Nebraska that constitutes a material change justifying modification of her child support obligation, but, rather, the fact she obtained certainty in her employment and income.

In further support of the modification of child support, the Nebraska Child Support Guidelines provide:

> Application of the child support guidelines which would result in a variation by 10 percent or more . . . upward or downward, of the current child support obligation . . . due

to financial circumstances which have lasted 3 months and can reasonably be expected to last for an additional 6 months, establishes a rebuttable presumption of a material change of circumstances.

Neb. Ct. R. § 4-217.

Jared satisfied the conditions of § 4-217 by establishing that at the time the decree was entered, Joey was not earning an income and there was uncertainty regarding her employment due to her intention to move to Grenada. In 2012, the year the original dissolution decree was entered, and the year she left for Grenada, Joey's adjusted gross income was $30,621. Since her return to Nebraska, Joey has obtained a master's degree in nursing, found stable employment in the field, and had the capacity to earn a stable income. In 2016, 2 years after her return from Grenada, Joey's adjusted gross income was $69,780.

[11] Among the factors to be considered in determining whether a material change of circumstances has occurred are changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. *Incontro v. Jacobs*, 277 Neb. 275, 761 N.W.2d 551 (2009). Based on Joey's substantial increase in income and stability of her employment in the nursing field, the district court did not abuse its discretion in finding a material change in circumstances warranting modification of child support.

### (b) Calculation of Jared's Income

Joey next generally asserts that the district court erred in determining Jared's income for child support purposes. She makes a number of allegations why the district court incorrectly adopted Jared's child support calculation worksheet.

### (i) Income Averaging Period

Joey first argues that the district court erred by using a 4-year income averaging period, rather than a 3-year average

of Jared's income. The Nebraska Child Support Guidelines, worksheet 1, provides: "In the event of substantial fluctuations of annual earnings of either party during the immediate past 3 years, the income may be averaged to determine the percent contribution of each parent . . . ." Joey cites to the Supreme Court's decision in *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007), in requesting that this court opine that a 3-year average should be a rebuttable presumption in cases involving a fluctuating income of one party. We respectfully decline to do so. While *Gress* acknowledged that both in Nebraska, and other jurisdictions, a 3-year average is the most common averaging period for fluctuating incomes, it did not make a 3-year period mandatory, nor a rebuttable presumption. In fact, the Supreme Court explicitly approved of a 4-year averaging period in *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012). Under the 4-year period used by the district court, Jared's total monthly income (before deductions) was $5,264. Under the 3-year averaging period suggested by Joey, Jared's monthly income would have been $5,453. Without any evidence as to why use of the 4-year period was "untenable or unreasonable" or otherwise is "against justice or conscience, reason, and evidence," we find no abuse of discretion in the district court's use of 4 years of income to determine Jared's child support obligation. See *Schrag v. Spear*, 290 Neb. 98, 104-05, 858 N.W.2d 865, 873 (2015).

### (ii) Jared's Depreciation Deductions

Joey also argues that the district court erred in determining Jared's income, because it should not have permitted his depreciation deductions for his construction business. We agree. We find that Jared did not meet his burden under the Nebraska Child Support Guidelines of showing that he was entitled to a depreciation deduction for certain assets of his business. Neb. Ct. R. § 4-204 (rev. 2020) provides, in relevant part:

> Depreciation calculated on the cost of ordinary and necessary assets may be allowed as a deduction from income

of the business or farm to arrive at an annualized total monthly income. After an asset is shown to be ordinary and necessary, depreciation, if allowed by the trial court, shall be calculated by using the "straight-line" method, which allocates cost of an asset equally over its useful duration or life. . . . A party claiming depreciation shall have the burden of establishing entitlement to its allowance as a deduction.

. . . Any party claiming an allowance of depreciation as a deduction from income shall furnish to the court and the other party copies of a minimum of 5 years' tax returns at least 14 days before any hearing pertaining to the allowance of the deduction.

The Supreme Court recently held in *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018), that § 4-204 provides the minimum requirements a party must establish in proving an entitlement to a depreciation deduction. In *Hotz*, the court found that the district court did not abuse its discretion by not deducting appellant's claimed depreciations from his monthly income:

[Appellant] submitted only his 2015 and 2016 personal and corporate income tax returns as evidence of his entitlement to an allowance of depreciation. This evidence is insufficient to warrant a deduction under the minimum of 5 years of tax returns requirement of the [Nebraska Child Support Guidelines]. Additionally, no evidence was provided that the depreciated assets were ordinary and necessary or that the depreciation was calculated by using the straight-line method. Therefore, the court did not abuse its discretion by not deducting [Appellant's] claimed depreciations from his total monthly income.

301 Neb. at 112-13, 917 N.W.2d at 476.

In this case, Jared similarly did not provide any evidence at trial that the business assets he claimed depreciation deductions on were "ordinary and necessary," nor that the depreciation amount he claimed was done so by using the straight-line

method, as required by § 4-204. The record also reveals that
Jared provided tax returns for only the years 2013 through
2016, which is 1 year shy of the 5-year minimum. Based on the
evidence presented at trial, Jared did not meet his burden and
he was not entitled to depreciation deductions under § 4-204.
We therefore must recalculate Jared's total monthly income
used for child support purposes.

The chart below reflects Jared's Schedule E income and
the total depreciation amounts claimed by his business for the
years 2013, 2014, 2015, and 2016. It also reflects one-half of
each annual depreciation amount, the amount attributable to
Jared as a 50-percent partner of his business:

|  | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|
| Schedule E Income | $32,232 | $100,360 | $63,717 | $56,342 |
| Depreciation | $51,035 | $19,996 | $53,262 | $32,733 |
| Half of Depreciation | $25,518 | $9,998 | $26,631 | $16,367 |

After determining the amount of depreciation that was incor-
rectly deducted from Jared's annual income, we add that
amount back to the Schedule E income to determine the
amount that should have been used in determining Jared's
4-year average:

|  | 2016 | 2015 | 2014 | 2013 |
|---|---|---|---|---|
| Schedule E | $32,232 | $100,360 | $63,717 | $56,342 |
| Half of Depreciation | $25,518 | $9,998 | $26,631 | $16,367 |
| TOTAL | $57,750 | $110,358 | $90,348 | $72,709 |

An average of the above recalculated annual incomes reveals
Jared's average annual income for the years 2013 through
2016 was $82,791, or $6,899 per month. This amount is the
amount that should have been used as Jared's total monthly
income in worksheet 1. For the various reasons discussed else-
where in this opinion, we amend only this line of the district
court's child support calculation in our recalculation of Joey's
child support obligation (see attached Appendix 1). We modify
Joey's monthly child support obligation to $1,289 for three
children, $1,134 for two children, and $807 for one child.

### (iii) Business Payments and
### Schedule E Income

Joey argues, as an alternative argument, that the district court erred in basing its determination of Jared's income on his Schedule E income rather than the amount of "[g]uaranteed [p]ayments" issued by his business. However, in her brief, Joey indicates that this assignment is "presented as an alternative, only in the event that the Court declines to add back Jared's depreciation deductions." Brief for appellant at 31. Because we found that awarding Jared depreciation deductions in determining his income was in error, we need not address this argument.

### (c) Filing Statuses of Parties

Joey's next assignment of error is that the district court erred when it used the wrong filing statuses for the parties on its child support calculation worksheet. We disagree. As previously mentioned, modification of child support orders are reviewed de novo on the record for an abuse of discretion. *McDonald v. McDonald*, 21 Neb. App. 535, 840 N.W.2d 573 (2013). An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

Counsel for Joey discusses at length the propriety of using the "Married Filing Jointly" status in conducting a child support calculation, but fails to discuss how the district court's decision to utilize that filing status was untenable or unreasonable, or how it is clearly against justice or conscience, reason, and evidence. Rather, counsel simply asserts that such "produced a child support obligation that was too high." Brief for appellant at 34. However, we agree with Jared that there is no evidence of the injury Joey would sustain from use of the "Married Filing Jointly" status and that any benefit or detriment caused applied equally to both parties because the same

filing status was used. Since both parties were remarried at the time of trial, we cannot say the district court abused its discretion in utilizing the "Married Filing Jointly" status in calculating the amount of child support owed.

### (d) Joey's Subsequently Born Child

Joey next asserts that the district court erred when it failed to give her credit for her subsequently born child on the child support calculation worksheet. We find that the district court did not abuse its discretion in declining to award Joey the credit.

[12,13] The Nebraska Child Support Guidelines provide, in certain circumstances, that "[s]ubject to § 4-220, credit may be given for biological or adopted children for whom the obligor provides regular support." Neb. Ct. R. § 4-205(E) (rev. 2016). The limitation, provided for in Neb. Ct. R. § 4-220 reads:

> An obligor shall not be allowed a reduction in an existing support order solely because of the birth, adoption, or acknowledgment of subsequent children of the obligor; however, a duty to provide regular support for subsequent children may be raised as a defense to an action for an upward modification of such existing support order.

The trial court has discretion to choose whether and how to calculate a deduction for subsequent children. *Schwarz v. Schwarz*, 289 Neb. 960, 857 N.W.2d 802 (2015). While Joey argues that this "'defense'" under § 4-220 "is not an 'affirmative defense' that needs to be explicitly pled," it nevertheless was her burden to raise the defense and present evidence in support of a deduction within the calculation of upward modification of child support. Reply brief for appellant at 6. The party requesting a deduction for his or her obligation to support subsequent children bears the burden of providing evidence of the obligation, including the income of the other parent of the child. *Schwarz v. Schwarz, supra*. Notably, in her proposed child support calculation, Joey did not provide any dollar amount that she alleged as support for her

subsequently born child. Worksheet 1, the basic net income and support calculation under the Nebraska Child Support Guidelines, specifically provides for "Regular Support for Other Children."

While Joey testified to the fact that she had a child as a result of her current marriage to Lee, she did not produce evidence of her obligation to support the child and of Lee's income to explain how the child support should be calculated, nor did she even raise the issue of the deduction. Joey did not meet her burden under § 4-220, and the district court did not abuse its discretion in failing to credit Joey for her subsequently born child in its child support calculation.

### (e) Retroactive Date of
### Child Support Award

[14,15] Joey's final assignment of error is that the district court erred when it made its child support award retroactive. We disagree. In its modification decree, the district court noted that "[Joey's] child support obligation should be applied retroactively to August 1, 2015, the first day of the month after the filing of the Counterclaim." In doing so, the district court cited the general rule that "absent equities to the contrary, . . . the modification of a child support order should be applied retroactively to the first day of the month following the filing day of the application for modification." *Roberts v. Roberts*, 25 Neb. App. 192, 206, 903 N.W.2d 267, 278 (2017). The children and the custodial parent should not be penalized for delay in the legal process, nor should the noncustodial parent gratuitously benefit from such delay. *McDonald v. McDonald*, 21 Neb. App. 535, 840 N.W.2d 573 (2013).

Joey argues that this case is distinguishable from the "traditional" modification case where the method of determining child support remains the same, and only the amount of support changes; rather, here, the *scope* of reimbursement has changed, creating a windfall for Jared. Joey argues this windfall comes in the form of retroactive child support without any credit

for the "'direct costs'" she paid under the original decree. Brief for appellant at 36. However, Joey interprets the district court's modification decree as having "changed [the] scope of reimbursable items to include medical expenses only." *Id*. We disagree with this interpretation. The modification order provided that Jared is to pay the first $480 in uninsured medical expenses but did not otherwise modify the original reimbursement provision, including expenses related to school, extracurricular activities, and daycare. Instead, the modification order provided that "all other terms and conditions of the Decree of Dissolution hereinbefore entered on July 16, 2012 not otherwise modified herein to remain in full force and effect." The modification order did not modify the original provisions related to reimbursable expenses the parties were, and still are, required to split equally between each other. These expenses are separate and distinct from the order of child support and were not altered in the district court's order of modification. Furthermore, Joey has not provided any evidence as to what "'direct costs'" she is entitled to reimbursement for, nor in what amount. Brief for appellant at 36. We therefore find that the district court did not abuse its discretion in ordering that the child support order be made retroactive to the first day of the month after the filing of the counterclaim.

## VI. CONCLUSION

Upon our review, we conclude that the district court did not abuse its discretion in refusing to modify child custody and parenting time and in modifying Joey's child support obligation. However, we find that the district court erred in awarding Jared depreciation deductions in its calculation of his monthly income. We have recalculated Joey's child support obligation, consistent with our findings, in the child support worksheet attached to this opinion as Appendix 1. We modify Joey's monthly child support obligation to $1,289 for three children, $1,134 for two children, and $807 for one child.

Affirmed as modified.

# APPENDIX 1

Case Name: Fichtl v. Fichtl
Worksheet 1 - Basic Income and Support Calculation

Mother: Married Filing Jointly / 2.5 Exemptions / Regular Employment
Father: Married Filing Jointly / 2.5 Exemptions / Self Employed

| Line | Description | Mother | Father |
|---|---|---|---|
| 1 | Gross Earned Taxable Income | $5,937.00 | $6,899.00 |
| 1 | Gross Unearned Taxable Income | $0.00 | $0.00 |
| 1 | Tax-Exempt Income | $0.00 | $0.00 |
| 2.a | Taxes - Federal | $436.11 | $493.06 |
| 2.a | Taxes - Nebraska | $161.90 | $191.44 |
| 2.b | FICA - Social Security / Railroad Retirement* | $368.09 | $790.03 |
| 2.b | FICA - Medicare | $86.09 | $184.77 |
| 2.c | Retirement | $237.48 | $275.96 |
| 2.d | Previously Ordered Support | $0.00 | $0.00 |
| 2.e | Regular Support for Other Children | $0.00 | $0.00 |
| 2.f | Health Insurance Premium for Parent | $0.00 | $0.00 |
| | Other Deductions | $0.00 | $0.00 |
| | Child Tax Credit | ($250.00) | ($250.00) |
| 2.g | Total Deductions | $1,039.67 | $1,685.26 |
| 3 | Net Monthly Income | $4,897.33 | $5,213.74 |
| 4 | Combined Net Monthly Income | $10,111.07 | |
| 5 | Combined Net Annual Income | $121,332.84 | |
| 6 | Each Parent's Percent | 48.44% | 51.56% |
| 7 | Monthly Support from Table (3 Children) | $2,661.00 | |
| 8 | Health Insurance Premium for Children | $0.00 | $0.00 |
| 9 | Total Obligation | $2,661.00 | |
| 10 | Each Parent's Monthly Share | $1,288.99 | $1,372.01 |
| 11 | Credit For Health Insurance Premium Paid | ($0.00) | ($0.00) |
| 12 | Each Parents' Final Share (3 Children, rounded) | $1,289.00 | $1,372.00 |

Worksheet 4 - Number of Children Calculation
(final shares are rounded to the nearest whole dollar)

| No. Children | Table Amt. | Table + Health Ins. | Mother's Share of Total | Father's Share of Total | Mother's Final Share | Father's Final Share |
|---|---|---|---|---|---|---|
| 3 | $2,661.00 | $2,661.00 | $1,288.99 | $1,372.01 | $1,289.00 | $1,372.00 |
| 2 | $2,341.00 | $2,341.00 | $1,133.98 | $1,207.02 | $1,134.00 | $1,207.00 |
| 1 | $1,666.00 | $1,666.00 | $807.01 | $858.99 | $807.00 | $859.00 |