IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

GRAMS V. MINNICK

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

RILEY GRAMS, APPELLANT,

V.

TIFFANY MINNICK, APPELLEE.

Filed December 9, 2025.    No. A-25-043.

Appeal from the District Court for Kearney County: MORGAN R. FARQUHAR, Judge. Affirmed as modified.

Loralea L. Frank and Isabelle R. Zito, of Bruner, Frank, Schumacher, Husak & Simpson, L.L.C., for appellant.

Adam R. Little, of Nebraska Legal Group, for appellee.

RIEDMANN, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Riley Grams appeals from the Kearney County District Court's order denying his request to modify custody of his son to a joint physical custody arrangement. He also challenges the district court's determination of his income when it modified his child support obligation. For the reasons stated below, we modify Riley's child support obligation but otherwise affirm the district court's order.

## II. BACKGROUND

Riley and Tiffany Minnick were never married. They share a son, Cooper, who was born in April 2018.

- 1 -

## 1. ORIGINAL ACTION IN 2019

In March 2019, Riley filed a complaint to establish paternity, custody, child support, and parenting time. The parties' "Settlement Agreement" was also filed. The district court entered an order approving the parties' settlement agreement and ordering the terms therein as the order of the court.

Pursuant to the settlement agreement, which had been signed by the parties in October 2018, the parties would have joint legal custody of Cooper, and Tiffany would have primary physical custody subject to Riley's "reasonable right to visitation" as set forth in the attached parenting plan. Riley would pay $656 per month in child support. The parties would split, "50/50," all unreimbursed medical, dental, orthodontia, and ophthalmological expenses, as well as all work-related childcare expenses.

Pursuant to the parenting plan, for "Regular Parenting Time," the parties agreed that "due to the child's infancy," Riley's parenting time would initially occur at Tiffany's residence at least two times per week; Riley's parenting time would be expanded "as is appropriate based on the child's age," and progress toward overnights at Riley's residence; and the parties would work toward a schedule where Riley would have parenting time every other weekend from Friday at 6 p.m. to Sunday at 6 p.m., "along with an evening visit once during each week." Riley was also entitled to "additional summer parenting time" as follows: 1 week in 2019, 2 nonconsecutive weeks in 2020, 3 nonconsecutive weeks in 2021, 4 nonconsecutive weeks in 2022, 5 weeks in 2023, and 6 weeks in 2024 and the years thereafter. A holiday parenting time schedule was also established. The parenting plan states that the "parents understand that with [Riley's] seasonal employment, flexibility in the parenting time schedule is essential." Additionally, "[t]he parents can temporarily change the terms of this Plan as long as they both agree to it."

## 2. CURRENT MODIFICATION ACTION

### (a) Complaint to Modify

On June 5, 2023, Riley filed a complaint for modification, seeking joint legal and physical custody of Cooper, a new parenting plan, and a recalculation of child support. He alleged that there had been a material change in circumstances since the 2019 order in that the parties were unable to make agreements regarding specified parenting time; Tiffany had been allowing more parenting time "but removes the additional parenting time when there is a disagreement or argument between the parties," thus using the parenting plan as a "'weapon'" to control and limit Riley's time with Cooper; Tiffany refused to communicate or make joint decisions regarding Cooper and his needs; Riley and Cooper "have a close and evolving relationship"; and the current parenting plan was no longer in Cooper's best interests.

In her "counter complaint," Tiffany generally denied the allegations in Riley's complaint. She sought "full legal and physical custody" of Cooper and a modification of the parties' summer parenting time schedule. She alleged that there had been a material change in circumstances since the 2019 order in that Riley indicated his intent to take Cooper for 5 weeks of summer parenting time in 2023, when he had never exercised extended summer parenting time in the past; the previous order was designed for Riley to progressively work up to 5 weeks of summer parenting time; he had never exercised more than 3 nights in a row with Cooper, with the exception of his

holiday parenting time for December 2022; Riley used Cooper "as a weapon" against her, and Riley put Cooper "in the middle" when he did not get his way; communication with Riley had become difficult and he had gone back on previous agreements after getting what he bargained for; and it was in Cooper's best interests to modify the summer parenting time schedule. Tiffany also sought a modification of child support, alleging that the parties' incomes had changed such that application of the child support guidelines would result in a variation by 10 percent or more. See Neb. Ct. R. § 4-217 (rev. 2008).

(b) Trial

Trial was held on June 17 and 18, 2024. The parties both testified and called other witnesses to testify, and numerous exhibits were received into evidence.

*(i) Custody and Parenting Time*

Cooper was 6 years old at the time of trial and was an active, fun, and loving child. By all accounts, the parties did not really follow the 2019 parenting plan for several years, and, instead, the parties worked things out between them. That included not adhering to a "set" weekend schedule or the same evening each week for Riley's parenting time. And at some point, Riley's parenting time included 3-day weekends and one weekly overnight; again, there was not a regularly set schedule. Although there were arguments and frustrations over parenting time, the parties continued with their "flexible" scheduling. Both parties testified that prior to the December 2022 to January 2023 holiday season, they would often split holidays so that each of them could spend time with Cooper. And the parties agreed that Riley did not exercise his extended summer parenting time prior to 2023.

a. Parties' Testimony

Tiffany believed she was flexible with Riley regarding adjustments to his parenting time and that initially they did well coparenting. If Riley requested extra parenting time, the parties "just agreed." "[I]t got to be consistent" that Riley would keep Cooper an extra night on his weekends (Friday to Monday morning).

The parties began a consistent every-other-weekend schedule around Father's Day 2022 because Tiffany had grown frustrated not having a set schedule. Until January 2023, Tiffany's coparenting relationship with Riley was "okay," "I mean, we had some disagreements . . . [and] had some things we had to work through," "[b]ut for the most part we tried to make it work with both of our schedules."

Tiffany testified that the parties had a "major disagreement" over the Christmas holiday in December 2022. The parties "never really followed a plan," and in previous years they tried to split time over Christmas. When Tiffany asked Riley about his family's plans for Christmas 2022, "he felt we needed to start alternating." That Christmas was "[t]echnically . . . my holiday, but he asked for it" because he had family in town. After some discussion, the parties agreed that Riley would have Cooper on Christmas Eve and Christmas morning, and then Tiffany would get Cooper starting at 10 a.m. on Christmas Day. Tiffany said that the parties were going to meet on December 26 and Riley would have Cooper from December 26 to 30, "at which time I would get Cooper back." However, on December 29, she got a text from Riley telling her that New Year's was his

holiday and that she could pick Cooper up on January 3, 2023. Tiffany was "[n]ot happy" and she and Riley "got in a heated ridiculous back and forth conversation, and he stated that he felt it was best to start following the parenting plan at which [sic] I pretty much agreed." Tiffany did not want to "pick and choose" what parts of the parenting plan they followed, so they went with their "court ordered parenting plan of every other weekend and his weekly visit" because "it just seemed like the best way to stop" the fighting. On cross-examination, Tiffany agreed Riley continued to have 3-day weekends until March, and that he still had a weekly overnight until May. It was after she and Riley could not agree on summer parenting time that she went back to the actual terms of the parenting plan; "[w]e were fighting too much."

Riley discussed the reasons for requesting a modification of custody and parenting time. He said that with his 3-day weekends and a weekly overnight, he had a minimum of 10 overnights per month with Cooper from sometime in 2019 or 2020 until March 2023. But then, "[f]or some reason all the sudden the three[-]day weekends were no longer acceptable" and were taken away. From March to May, Riley's parenting time was every other weekend from Friday at 6 p.m. to Sunday at 6 p.m., and one weekly overnight. In May, when Riley asked for his 5 weeks of summer parenting time, his "weekly overnights were taken away." In a period of 3 months, Riley had gone from having 10 overnights to having 4 overnights per month. When asked what had happened, Riley said he was "not sure," "all I was given was I want to follow the parenting plan for [the] holiday schedule[,] and this is the way it's going to be."

Upon further inquiry, Riley explained that in the past he and Tiffany had not followed the established holiday parenting time schedule. "It seemed every year we tried to split them up, make it work so Cooper could have time with both families," "[b]ut it was just always conflict." Around December 2022 to January 2023, Riley expressed his desire to start following the holiday schedule. He affirmed that Tiffany's response was that if they were going to follow the holiday time, they were going to follow everything. That meant that he lost time with Cooper. The loss of time "was devastating to both me and Cooper" and "definitely hurt our relationship." Cooper "didn't understand why all the sudden he was going back and why we had to do this." In the 13 months since filing the action in June 2023, Riley had "two additional overnights."

Additionally, in early 2023, Tiffany approached Riley about a move to Kansas (about 7 miles across the state line) for a job opportunity and to be closer to her boyfriend at the time. Tiffany testified that Cooper had not started school yet, so a discussion needed to be had about whether he would go to school in Nebraska (because Tiffany would still live close enough to that school) or whether he would go to a school in Kansas. During his testimony, Riley was asked if--after he was approached by Tiffany and received a draft of a new parenting plan--it started to make sense as to why his parenting time was being reduced. Riley responded, "Yes, it did." Riley made it clear to Tiffany that he would not sign the updated parenting plan or allow the out-of-state move. Tiffany testified that she did not end up moving to Kansas and had no current plans to do so.

Riley confirmed that when he informed Tiffany he would be taking his 5 weeks of parenting time in the summer of 2023, she said that was not going to work. Tiffany testified that she was "reluctant" when Riley requested 5 weeks of parenting time, and she "counteroffered him three weeks." Riley confirmed that he had not previously taken his extended summer parenting time, and instead had taken "[t]he three day weekend, three day overnights, the weekly overnights,

whenever it worked out that I could get a longer period of time, whether it be four days or whatever else." When asked if he believed he had exercised his 4 weeks of summer parenting time in 2022 even though it was not in blocks, Riley responded, "Yes, I do." However, on cross-examination, he was asked if he did all 4 weeks of summer parenting time in 2022, and he said he did not. Riley was able to exercise his 5 weeks of summer parenting time in 2023 after "go[ing] to court" and "get[ting] a court order." He planned to exercise his 6 weeks of summer parenting time in 2024 pursuant to the current parenting plan. Both parties agreed that summer parenting time under the current parenting plan needed to be more clearly defined, and both parties agreed to alternating weeks of parenting time in the summers.

Both parties also testified about their ability to communicate with one another. According to Riley, Tiffany unilaterally made decisions for Cooper. Tiffany enrolled Cooper in a particular school district without discussing it with Riley. She hyphenated Cooper's last name on his school bag even though Cooper had Riley's last name. She told Riley that he could not contact the school, and everything had to go through her. And Tiffany occasionally signed Cooper up for sports without Riley's knowledge; Riley said, "I want to be involved," "[i]t just would be nice if we had better communication about it."

According to Tiffany, after the holiday 2022-2023 incident, she still tried to coparent with Riley and involve him in decisions about Cooper. She tried to plan a joint birthday party for Cooper as they had done in the past, but Riley did not show up and then had his own party. Tiffany stated that she enrolled Cooper in the same school as her older daughter. Enrolling Cooper in school was "nothing that was ever actually discussed," but "we both knew that he was going to go to kindergarten, and I assumed that [Riley] knew where I was going to enroll him." Looking back, she understood that a discussion should have been had with Riley. As for Cooper's last name, "his legal last name is Grams," but Tiffany "was not ever comfortable with that for different reasons" and Cooper had "gone by Minnick-Grams"; that is what was on his bank account, his medical records, his school enrollment, "[a]nything with his name is Minnick-Grams." As for contact with the school, text messages received into evidence show that Tiffany told Riley that the school preferred all communication regarding school pick-ups go through the custodial parent (her) to eliminate confusion.

Tiffany agreed that parents should work together to reach agreements for their child's best interests, and that "[f]or the most part" she and Riley had done a decent job of communicating with one another. "It hasn't always been respectful between the two of us, but we do our best." They primarily communicated via text messages.

Riley believed that it was easier to communicate with Tiffany in writing than to do so face-to-face. The parties previously had a 45-minute "heated conversation" during a parenting time exchange while "Cooper was sitting in the vehicle by himself"; the parties were "yelling" and "shouting" and "[i]t was just not something that we need to be doing anymore." (Tiffany testified that the conversation was about the 4th of July weekend in 2023, and she believed that Riley exaggerated how long the conversation lasted. However, she acknowledged that those types of conversations should not happen in front of Cooper.) Riley believed that communication in writing, via texts or email, "gives everybody time to think, time to respond, time to cool off so that things don't come out that you regret saying later."

Numerous text messages between the parties were received into evidence. The messages reveal numerous arguments, including about how to split holidays, whether to continue being flexible with parenting time or follow the parenting plan, whether each party was being as accommodating as the other regarding schedule changes and requests for additional time, and Riley's summer parenting time. The parties even argued about whether Riley should have to give Cooper a bath during his parenting time one evening. On numerous occasions, Tiffany used profanity in her text messages to Riley. During her testimony, Tiffany admitted that at times she was frustrated and said things that she regretted.

Tiffany believed that a majority of the issues that arose between the parties revolved around the holiday and summer parenting time schedules. She "hope[d]" that a set schedule would resolve a lot of the parties' issues.

Riley wanted to continue having joint legal custody of Cooper and wanted to continue trying to communicate with Tiffany because "[s]he's Cooper's mom" and "[h]e needs to learn that his parents can work together." Riley respected Tiffany as Cooper's mother and tried to be respectful. He believed he tried to be flexible in allowing Tiffany time for things that were important for her and her family, but he did not believe that Tiffany had reciprocated. (We note that the text messages received into evidence reveal that both parties could be flexible with one another, but also that both parties could be inflexible at times.)

Riley was requesting joint physical custody of Cooper, with a weekly parenting time arrangement. Under the current parenting plan, Riley had regular parenting time with Cooper every other weekend from Friday at 6 p.m. to Sunday at 6 p.m., and one evening each week. However, Riley believed it was in Cooper's best interests to spend equal time with both parents and to have "a male role model in his life more of the time." He also believed his proposed parenting plan would reduce the parties' arguments. According to Riley, "[t]he only few issues" with a weekly parenting time rotation would be his "plant and harvest seasons," "[b]ut those are a couple weeks" and he "would be willing to give up those weeks" or have his family help him with Cooper. Riley said he and Tiffany currently lived 30 minutes away from each other, but he had plans to move closer "[n]ext year," at which point they would live 15 minutes apart. Under Riley's proposed parenting plan, the parties would have joint legal and physical custody, alternating weeks of parenting time year-round with exchanges occurring on Mondays at 6 p.m., and a specified holiday parenting time schedule. Riley believed that his proposed parenting plan was in Cooper's best interests.

Tiffany did not believe that joint physical custody was in Cooper's best interests because "[t]here's just too much history of irresponsibleness, lack of structure, lack of stability," and Cooper needs structure and stability. However, Tiffany acknowledged that she did not have evidence that Riley was irresponsible or lacked structure or stability for Cooper in the past 2 years. Tiffany believed that Cooper was doing well in her care and with Riley's current parenting time, and she did not see any reason to change that.

b. Testimony of Other Witnesses

Stephanie Hunt testified that she has known Tiffany for many years and had no concerns about her parenting. Hunt dated Riley for "a couple months" in the summer of 2020. When asked if she ever observed Riley turn down parenting time with Cooper, Hunt replied, "There was a

couple times that I recall we had plans to go to the lake and he would either find a baby-sitter or tell Tiffany that something came up and he was not able to take Cooper." On the "few times" Hunt was at Riley's house when Cooper was there, Cooper was sleeping. When asked what she and Riley were doing while Cooper was sleeping, she responded, "[d]rinking," and it was "[s]everal" drinks. She also observed Riley smoke marijuana and recalled that Cooper was in the house on one of those occasions. According to Riley, he was only involved with Hunt from June 28 to July 21, and she was never at his home when Cooper was there. Further, he said he declined parenting time only one time because he had plans with Hunt (Tiffany had asked him to pick Cooper up one evening so that she could go to volleyball league during her weekend of parenting time).

Both parties called friends to testify on their behalf. Riley's friends testified that he was a "great person," had a good relationship with Cooper, and that he met Cooper's needs. They had no concerns about Riley's parenting. Tiffany's friends testified that she was a good and loving mother, and they had no concerns about her parenting. Although Tiffany could get frustrated with Riley, her friends never heard her express those frustrations in front of Cooper.

Riley's mother believed that joint custody would be in Cooper's best interests because "every little boy needs his daddy" and Riley "is a great father." Riley's mother was concerned because "now that all this has started, [Tiffany] puts Cooper in the middle." However, Riley's mother affirmed that Riley fostered and promoted Cooper's relationship with Tiffany.

Hans Burken testified that he has known Tiffany for 25 years and they have a 15-year-old daughter together. Hans and Tiffany did not have a court-ordered parenting plan, but currently their daughter resides with Tiffany during the school year and with Hans during the summer; the other parent has parenting time every other weekend. Hans and Tiffany "try to split" the holidays so that their daughter is "with both families on most holidays"; if holiday plans overlap, they try to "make it work" on the next holiday. Hans said that their parenting plan has "evolved over time as needed with [the daughter's] age"; 2024 was the fifth summer that his daughter had resided with him. Hans and Tiffany are able to agree on schedule changes as needed. They also discuss major decisions regarding their daughter. He believed that he had been able to effectively coparent with Tiffany, and he had no concerns about her parenting.

Kara Burken is Hans' wife and testified that she has known Tiffany for 10 years. Kara said that Hans and Tiffany had a "[g]ood" relationship and were "able to talk like adults and come with [sic] agreement on questions of specific things for [their daughter] and her needs." Kara affirmed that Hans and Tiffany appeared to be flexible with each other. Kara had no concerns about Tiffany's parenting.

*(ii) Child Support*

Tiffany testified that she worked for an "ag construction company," earning $70,000 per year.

Riley testified that he is a self-employed farmer and takes $4,000 per month in income.

Additionally, Riley formed RDG Equipment, LLC, in 2018 with his father "as a method to buy [his father] out of his farm equipment" over a period of 20 years. Riley explained, "Over time as I make a payment to him I get an increase in the percentage of the LLC," "it is my decision or whatever to purchase the new equipment for the LLC," and "I fund everything that goes into the LLC." The goal is for Riley to own 100 percent of RDG Equipment, and he currently owned

"around 70 percent." He does not take any compensation from RDG Equipment, it "is strictly equipment purchasing, equipment repairs." On cross-examination, Riley testified that he typically makes payments of "around 70,000" per year out of his farm account for RDG Equipment, but "[i]t varies on a year-to-year basis."

Riley is also a member of Upland Grain, LLC; he "own[s] it with [his] two uncles" and it is used "for storage of our farm equipment and our grain." Riley was purchasing his share in Upland Grain from his father for $70,000, with a 10-year payoff plan that began in 2018; he paid his father $7,000 per year from his farm account. Riley did not receive any compensation from Upland Grain.

On cross-examination, Riley was asked how he paid $70,000 per year for RDG Equipment and $7,000 per year for Upland Grain if he was only taking home $4,000 per month. Riley responded, "I have a farm account, a personal checking account, and a RDG account." The payments were taken out of his farm account as "an expense." There was also testimony that Riley planned to build a 4- to 6-bedroom house on land he was in the process of purchasing from his grandfather. He was asked if that would be paid for out of his farm account, and Riley responded, "It's hard to say." He was then asked if building a home and buying land was something he was able to do on his $48,000 annual income, and Riley replied, "Yes." Riley also contributed $5,000 per year to Cooper's 529 plan.

Spencer Hruby testified that he had been Riley's accountant since 2021. Hruby did the accounting for Riley's personal business and RDG Equipment. Riley owned 60.35 percent of RDG Equipment in 2021, 65.26 percent in 2022, and 69.76 percent in 2023. Riley and RDG Equipment filed tax returns, and the K-1 from RDG Equipment can be found in Riley's personal tax returns. Hruby does not "do the books" for Upland Grain, LLC; he "only receive[s] the K-1 that he put[s] into the return." Riley's tax returns from 2021, 2022, and 2023 were received into evidence.

Hruby testified that Riley takes a "personal draw of about $4,000 a month" for his wages. Riley does not take any money out of RDG Equipment. The money generated by RDG Equipment "just pays for the equipment," "all the loans, all the expenses, insurance." On cross-examination, Hruby confirmed that Riley did not take a draw out of RDG Equipment. When asked if the company bought new equipment instead, Hruby responded, "They purchase equipment each year, yes." When asked if that was a "choice for the company to make in buying new equipment," he responded, "Farmers need equipment[,] [s]o it's a choice to keep on farming and have the equipment to be able to farm, yes." Hruby was asked if Riley, being a nearly 70 percent owner, had the option to take a draw from RDG Equipment. He responded, "[Riley] has the option to make draws[,] [i]t just depends if the LLC has money to do that." Based on Hruby's review of the K-1s from Upland Grain, Riley does not receive any money from that LLC.

In Tiffany's proposed child support calculation, she attributed an income of $27,739.81 per month ($332,877.72 per year) to Riley. Tiffany prepared an "Income Summary" document to show how she calculated Riley's income; it was received as a demonstrative exhibit. In her "Income Summary," she combined Riley's "Net Farm Profit" from his personal tax return and his "RDG Equipment LLC Income" for 2021, 2022, and 2023, and then used a 3-year average of his combined incomes. (The RDG Equipment Income was calculated using information from the entities' tax return.) Riley testified that the monthly income Tiffany attributed to him is "not a realistic number" and "I don't believe I make anywhere close to that a month."

According to Hruby, Tiffany's "Income Summary" was not an accurate representation of Riley's actual income, and it inflated his income. When asked about the flaws he saw in the summary, Hruby said, "The main thing I'm seeing is in each of the tax years for RDG Equipment they're removing the depreciation expense from the total expenses but not adding back in the straight[-]line depreciation for that expense that was taken away after the depreciations." (The "Section 179 Depreciation[s]" listed in Tiffany's summary actually included both the § 179 depreciation and the standard depreciation.) "It should just be recalculated" and "there should be a portion of [the depreciation] added back in." He explained that the standard depreciation is what is used on a "double claiming method." Hruby did not prepare straight-line calculations for 2021, 2022, or 2023.

On redirect, Hruby confirmed that it is common for farmers to have big swings in farming operations over the course of years. This is due to the "[c]hange in grain prices, input expenses, insurance payouts, everything." When asked if it was a fair representation that Riley's income is $4,000 per month, Hruby responded, "Yes."

The following colloquy was had between the district court and Hruby.

THE COURT: All right. You testified that . . . you base your depreciation on double declining balance; is that right?

A [Hruby] Correct.

THE COURT: Would that be similar to a straight[-]line depreciation for those assets not under section 179?

A Yeah. It's very similar. It's the most accurate depreciation method we have for farm equipment, especially those first couple years it drops off fairly significantly fast. So it kind of front loads depreciation, and then kind of goes down slightly. But it's fairly close to straight line.

THE COURT: Okay. Thank you.

Upon further questioning by Tiffany's counsel, Hruby confirmed that, based on Riley's personal tax returns, his "total income" was $121,893 in 2021, $88,426 in 2022, and $112,622 in 2023, and those amounts included all the depreciation that was taken for RDG Equipment.

(c) District Court's Order

On August 22, 2024, the district court entered an order finding that Riley failed to prove that there had been a material change in circumstances that would necessitate a modification of physical custody. However, the court approved the parties' stipulation that the summer parenting time should be modified, and that the parties should have alternate weeks of parenting time with Cooper during his summer school vacation, with parenting time exchanges to occur on Mondays.

The district court did modify Riley's child support obligation, increasing his obligation to $1,274 per month, with a 50 percent abatement for the months of June, July, and August. The court's child support calculation utilized a monthly income of $5,833.33 for Tiffany ($70,000 per year), and $13,947.58 for Riley ($167,371 per year). In determining Riley's income, the court combined his 3-year average incomes from his personal tax returns (adjusted gross income (AGI)) and RDG Equipment.

Riley's motion for new trial or, in the alternative, to alter or amend, was denied after a hearing.

Riley appeals.

## III. ASSIGNMENTS OF ERROR

Riley assigns, restated, that the district court erred by (1) not finding a material change in circumstances existed to modify custody and by failing to award him joint physical custody with week-on-week-off parenting time, (2) adopting the wrong child support calculation and incorrectly calculating his income, and (3) denying his motion for new trial or, in the alternative, to alter or amend.

## IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion. *Sulzle v. Sulzle*, 318 Neb. 194, 14 N.W.3d 532 (2024).

When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than the other. *Keiser v. Keiser*, 310 Neb. 345, 965 N.W.2d 786 (2021).

An appellate court reviews a trial court's ruling on a motion for a new trial or reconsideration for an abuse of discretion. *Jaeger v. Jaeger*, 307 Neb. 910, 951 N.W.2d 367 (2020).

An abuse of discretion occurs when a trial court's decision or reasoning is clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## V. ANALYSIS

### 1. MODIFICATION OF CHILD CUSTODY AND PARENTING TIME

Riley claims the district court erred by not finding a material change in circumstances existed to modify custody and by failing to award him joint physical custody with week-on-week-off parenting time.

Custody of a minor child will not ordinarily be modified absent a material change in circumstances, which shows either that the custodial parent is unfit or that the best interests of the child require such action. *Id.* It is the burden of the party seeking modification to show a material change in circumstances. *Id.* Specifically, the movant must show two elements: First, that since entry of the most recent custody order, there has been a material change in circumstances that affects the child's best interests, and second, that it would be in the child's best interests to change custody. *Id.*

The Nebraska Supreme Court has defined a material change in circumstances as the occurrence of something that, if it had been known at the time the most recent custody order was entered, would have persuaded that court to decree differently. See *id.* Circumstances having occurred before the most recent custody order are relevant only insofar as they bear on whether the change in circumstances since the most recent custody order are material and substantial.

*Id.* Before custody is modified, it should be apparent that any material change in circumstances alleged will be permanent or continuous, not merely transitory or temporary. *Id.*

The district court found that Riley failed to prove that there had been a material change in circumstances that would necessitate any modification of physical custody as it exists in the negotiated parenting plan, other than what was agreed to by the parties for alternating weeks of parenting time in the summer.

Riley contends that the district court abused its discretion when it failed to find a material change in circumstances existed, warranting a modification. He argues that he "proved the current parenting plan resulted in immense conflict and poor communication between the parties," and Tiffany "unilaterally revoked [his] parenting time promised under an informal agreement in retaliation" for his requests that the parties follow "some of the more structured provision of the parenting plan in an attempt to reduce conflict and chaos." Brief for appellant at 19.

In response, Tiffany claims that "Riley wants to have his cake and eat it too." "He wants strict enforcement of the parenting plan when it benefits him yet demands that [she] be flexible and give him additional time beyond what was required." Brief for appellee at 13. Her "desire to abide by the parenting plan in response to Riley's inconsistent approach is . . . not a material change in circumstances." *Id.* And "the parties' inability to communicate effectively strongly supports the original award of sole custody to [her]." *Id.*

As noted by Tiffany, the parties' parenting plan "specifically allows for temporary changes to the plan (such as allowing additional parenting time on a *temporary* basis)," "and flexibility with the regular schedule with a specific fallback schedule in the event they cannot agree." *Id.* at 16 (emphasis in original). "The plan likewise provides for flexibility in sharing holidays, with a specific schedule also included." *Id.*

Pursuant to the parenting plan, for "Regular Parenting Time," the parties were to work toward a schedule where Riley would have parenting time every other weekend from Friday at 6 p.m. to Sunday at 6 p.m., "along with an evening visit once during each week." Riley was also entitled to "additional summer parenting time" beginning with 1 week in 2019, and increasing 1 additional week each summer until 2024 when he would have 6 weeks of parenting time. A holiday parenting time schedule was also established. The parenting plan states that the "parents understand that with [Riley's] seasonal employment, flexibility in the parenting time schedule is essential." Additionally, "[t]he parents can temporarily change the terms of this Plan as long as they both agree to it."

For several years, the parties did not follow the specific schedule set forth in their parenting plan and instead worked together and were flexible in order to accommodate Riley's employment. Although Riley often had 3-day weekends and an overnight with Cooper during the week, Riley did not exercise his full-week(s) blocks of summer parenting time. When the parties could no longer agree to share holidays, and when Riley expressed his desire to exercise his allotted summer parenting time, Tiffany believed they should revert to their parenting plan schedule for regular parenting time as well. Because the parties' parenting plan specifically contemplated the need for flexibility due to Riley's employment, and an allowance for the parties to "temporarily" change the terms of the plan upon the agreement of both parties, we cannot say that Riley met his burden to show a material change in circumstances warranting a modification of custody. See *Fichtl v. Fichtl*, 28 Neb. App. 380, 944 N.W.2d 516 (2020) (concluding that district court did not abuse its

discretion in finding mother did not meet her burden of proof in showing material change in circumstances warranting modification of custody and parenting time; parenting plan stated parents agreed to have flexible parenting time due to work schedules of parents, but set forth specific schedule in event parents did not agree; father's failure to provide mother liberal parenting time was not material change in circumstances because possibility that parties may not agree on liberal parenting time was accounted for in parenting plan). It was not an abuse of discretion for the district court to find that Riley did not meet his burden in showing a material change in circumstances. Accordingly, the district court did not abuse its discretion when it declined to modify child custody to award Riley joint physical custody with week-on-week-off parenting time, other than what was agreed to by the parties for alternating weeks of parenting time in the summer.

## 2. CHILD SUPPORT

Riley claims that the district court abused its discretion by adopting the wrong child support calculation and incorrectly calculating his income. Riley argues that the district court should have adopted a joint custody child support calculation. However, we have already determined that the district court did not abuse its discretion when it declined to award Riley joint physical custody; accordingly, a joint custody child support calculation was not warranted. Thus, we turn to Riley's claim that the district court incorrectly calculated his income in the sole custody child support calculation. He does not dispute that there was a material change in circumstances to modify child support. See § 4-217 (rebuttable presumption of material change in circumstances when application of child support guidelines results in 10 percent or more variation, upward or downward, of current child support obligation, due to financial circumstances which have lasted 3 months and can reasonably be expected to last for additional 6 months).

The Nebraska Child Support Guidelines provide that in calculating the amount of support to be paid, a court must consider the total monthly income. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004). See Neb. Ct. R. § 4-204 (rev. 2020). Section 4-204 provides, in relevant part:

(A) Total monthly income is the income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages. This would include income that could be acquired by the parties through reasonable efforts. For instance, a court may consider as income the retained earnings in a closely-held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate. . . .

. . . .

(C) Depreciation calculated on the cost of ordinary and necessary assets may be allowed as a deduction from income of the business or farm to arrive at an annualized total monthly income. After an asset is shown to be ordinary and necessary, depreciation, if allowed by the trial court, shall be calculated by using the "straight-line" method, which allocates cost of an asset equally over its useful duration or life. . . . A party claiming depreciation shall have the burden of establishing entitlement to its allowance as a deduction.

(D) . . . . Any party claiming an allowance of depreciation as a deduction from income shall furnish to the court and the other party copies of a minimum of 5 years' tax returns at least 14 days before any hearing pertaining to the allowance of the deduction.

The Nebraska Supreme Court has not set forth a rigid definition of what constitutes income, but instead has relied upon a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present in child support cases. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). Thus, income for the purposes of calculating child support is not necessarily synonymous with taxable income. *Id.* We take this flexible approach in determining a person's "income" for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature. *Id.*

The district court's child support calculation utilized a monthly income of $5,833.33 for Tiffany ($70,000 per year), and $13,947.58 for Riley ($167,371 per year). In determining Riley's income, the district court combined his 3-year average adjusted gross income from his personal tax returns and his 3-year average net income from RDG Equipment.

When calculating Riley's income, the district court stated Riley had the following "adjusted gross incomes as reflected in his Form 1040":

| | |
|---|---|
| 2021 | $105,545.00 |
| 2022 | 74,689.00 |
| 2023 | 96,901.00 |
| Total | $277,135.00 |

The 3-year average adjusted gross income is $92,378.33

The court included the following "summary of RDG's income tax returns":

| Year | Plaintiff's % | Net Income | § 179 Deduction | Plaintiff's Recalculated Net Income |
|---|---|---|---|---|
| 2021 | 60.35% | $ 8,267.00 | $ 8,266.00 | $ 10,001.81 |
| 2022 | 65.25% | $285,207.00 | 188,900.00 | 309,402.23 |
| 2023 | 69.76% | <$134,233.00> | 0.00 | $<94,426.17> |
| | | | | $224,977.87 |

The 3-year average income is $74,992.62

(For each year, the court calculated Riley's RDG Equipment Income by combining RDG Equipment's net income, adding back in the § 179 deduction, and then multiplying that amount by Riley's ownership percentage.) A § 179 deduction is, in effect, accelerated depreciation taken in the year property is placed in service. *Gammel v. Gammel*, 259 Neb. 738, 743, 612 N.W.2d 207, 211 (2000).

There is no dispute as to Tiffany's income. But Riley claims the district court incorrectly calculated his income. Riley argues that his income "[w]as [o]nly $4,000 [p]er [m]onth." Brief for appellant at 31. However, at trial Riley's accountant confirmed that Riley's "total income" was $121,893 in 2021, $88,426 in 2022, and $112,622 in 2023, and that those amounts included all the depreciation that was taken for RDG Equipment. And Riley's individual income tax returns

- 13 -

received into evidence show that his AGI was $105,545 in 2021, $74,689 in 2022, and $96,901 in 2023. Accordingly, the evidence clearly established that Riley's income was more than $4,000 per month.

Riley next contends that even if this court disagrees that his income was only $4,000 per month, we should "at least find the District Court's use of [RDG Equipment's] income was wrong." Brief for appellant at 33. He argues his AGI already accounted for the income and loss of RDG Equipment and therefore the court used the net income twice. We agree that Riley's ordinary business income or loss from RDG Equipment was double counted. His ordinary business income or loss from each year is found in his Schedule K-1, and utilized in Scheule E and Schedule 1 of his federal individual income tax return to calculate his AGI. Thus, when the district court separately calculated Riley's income or loss from RDG Equipment and then added that amount to his AGI to arrive at a total yearly income of $167,371 per year ($13,947.58 per month), the RDG income or loss was counted twice. This was an abuse of discretion. To add the § 179 deduction back into Riley's income, the district court should have simply added the § 179 deduction amount (found in his Schedule E) to his AGI. We set forth that calculation below.

|  | 2021 | 2022 | 2023 |
|---|---|---|---|
| AGI | $105,545 | $ 74,689 | $96,901 |
| + § 179 | $ 4,989 | $123,276 | $ 0 |
| Total | $110,534 | $197,965 | $96,901 |

The 3-year average income is $135,133.33

An income of $135,133.33 per year ($11,261.11 per month) is the amount that should have been attributed to Riley for purposes of calculating child support.

Riley argues that the § 179 deductions should not have been added back in to his income for purposes of child support because they were related to "ordinary and necessary business expenses" allowable under § 4-204(C). Reply brief for appellant at 8. However, Nebraska Child Support Guidelines, Worksheet 1, first comment, provides,

> Court will require copies of last 2 years' tax returns to verify "total income" figures and copies of present wage stubs to verify the pattern of present wage earnings, *except where a party is claiming an allowance of depreciation as a deduction from income, in which case a minimum of 5 years' tax returns shall be required.*

(Emphasis added.) Riley provided only 3 years of tax returns and has therefore failed to meet the requirement for a depreciation deduction from income for purposes of child support. See, *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018) (submission of only 2 years of tax returns insufficient to warrant depreciation deduction under minimum 5 years of tax returns required by guidelines); *Fichtl v. Fichtl*, 28 Neb. App. 380, 944 N.W.2d 516 (2020) (pursuant to § 4-204, 4 years of tax returns insufficient for depreciation deduction).

We have completed a new Worksheet 1 – Basic Income and Support Calculation, which is attached to this opinion. Riley's child support obligation is $1,093 per month, and we modify the district court's August 22, 2024, order accordingly.

### 3. MOTION FOR NEW TRIAL OR RECONSIDERATION

Riley claims the district court abused its discretion by denying his motion for new trial or, in the alternative, to alter or amend. He argues that the court's order denying his request for joint physical custody and its child support calculation were "not sustained by sufficient evidence." Brief for appellant at 36. Because we have already addressed the merits of the physical custody and child support issues, we need not address the district court's denial of Riley's motion for new trial or to alter or amend. See *Ronnfeldt Farms v. Arp*, 317 Neb. 690, 11 N.W.3d 371 (2024) (appellate court not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it).

## VI. CONCLUSION

For the reasons stated above, we find that the district court did not abuse its discretion when it found that Riley failed to prove that there had been a material change in circumstances warranting the modification of physical custody or parenting time. However, we find that the court did abuse its discretion in calculating Riley's income for purposes of child support. Using our Worksheet 1 calculation, we find that Riley's child support obligation should be $1,093 per month, and we modify the district court's order accordingly.

AFFIRMED AS MODIFIED.

Case Name: <u>Grams v. Minnick</u>
Worksheet 1 - Basic Income and Support Calculation

Mother: Head of Household / 1.5 Exemptions / Regular Employment
Father: Single / 1.5 Exemptions / Self Employed

| Line | Description | Mother | Father |
|------|-------------|--------|--------|
| 1 | Gross Earned Taxable Income | $5,833.33 | $11,261.11 |
| 1 | Gross Unearned Taxable Income | $0.00 | $0.00 |
| 1 | Tax-Exempt Income | $0.00 | $0.00 |
| 2.a | Taxes - Federal | $446.67 | $1,615.65 |
| 2.a | Taxes - Nebraska | $169.68 | $492.25 |
| 2.b | FICA - Social Security / Railroad Retirement* | $361.67 | $1,289.55 |
| 2.b | FICA - Medicare | $84.58 | $301.59 |
| 2.c | Retirement | $0.00 | $0.00 |
| 2.d | Previously Ordered Support | $0.00 | $0.00 |
| 2.e | Regular Support for Other Children | $0.00 | $0.00 |
| 2.f | Health Insurance Premium for Parent | $117.65 | $148.76 |
|  | Other Deductions | $0.00 | $0.00 |
|  | Child Tax Credit | ($166.67) | ($0.00) |
| 2.g | Total Deductions | $1,013.58 | $3,847.80 |
| 3 | Net Monthly Income | $4,819.75 | $7,413.31 |
| 4 | Combined Net Monthly Income | $12,233.06 | |
| 5 | Combined Net Annual Income | $146,796.68 | |
| 6 | Each Parent's Percent | 39.4% | 60.6% |
| 7 | Monthly Support from Table (1 Child) | $1,508.00 | |
| 8 | Health Insurance Premium for Children | $296.42 | $0.00 |
| 9 | Total Obligation | $1,804.42 | |
| 10 | Each Parent's Monthly Share | $710.94 | $1,093.48 |
| 11 | Credit For Health Insurance Premium Paid | ($296.42) | ($0.00) |
| 12 | Each Parents' Final Share (1 Child, rounded) | $415.00 | $1,093.00 |

Worksheet 4 - Number of Children Calculation (final shares are rounded to the nearest whole dollar)

| No. Children | Table Amt. | Table + Health Ins. | Mother's Share of Total | Father's Share of Total | Mother's Final Share | Father's Final Share |
|--------------|-----------|---------------------|-------------------------|-------------------------|----------------------|----------------------|
| 1 | $1,508.00 | $1,804.42 | $710.94 | $1,093.48 | $415.00 | $1,093.00 |